SANFORD L. MICHELMAN (SBN 179702)
(smichelman@mrllp.com)
**MICHELMAN & ROBINSON, LLP**
15760 Ventura Boulevard, 5th Floor
Encino, CA 91436
Telephone:  (818) 783-5530
Facsimile:   (818) 783-5507

MONA Z. HANNA (SBN 131439)
(mhanna@mrllp.com)
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Ave., 10th Fl
Irvine, CA 92614
Telephone:  (714) 557-7990
Facsimile:   (714) 557-7991

Attorneys for TRUMAN CAPITAL
ADVISORS, LP, a limited partnership

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| NATIONSTAR MORTGAGE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>TRUMAN CAPITAL ADVISORS, LP, a limited partnership,<br><br>Defendant. | Case No. SACV13-01114 RNB<br><br>**DECLARATION OF ROBERT PILIERO IN SUPPORT OF TRUMAN CAPITAL ADVISORS, LP'S MOTION TO DISMISS THE COMPLAINT**<br><br>[Filed concurrently with Notice and Motion, Proposed Order and Certificate of Interested Parties] |

1

## DECLARATION OF ROBERT PILIERO

**ROBERT PILIERO**, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.  I am an attorney admitted to practice law in the State of New York. I am a shareholder at Butzel Long, a professional corporation, and I am co-counsel for defendant Truman Capital Advisors, LP ("TCA") in this matter. I have personal knowledge of the facts set forth below and if properly called to testify as a witness, I could and would testify thereto.

2.  I respectfully submit this declaration in support of TCA's motion to dismiss Nationstar Mortgage, LLC's ("Plaintiff" or "Nationstar") Complaint for Declaratory Relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and pursuant to the Court's broad discretion vested in the Declaratory Judgment Action, 28 U.S.C. § 2201(a).

3.  A true and correct copy of the Complaint, dated July 29, 2013, filed in the Supreme Court of the State of New York styled *Truman Capital Advisors, LP, et al. v. NationStar Mortgage LLC*, Index No. 652652-13 is attached hereto as Exhibit 1.

4.  A true and correct copy of the declaratory judgment Complaint in this action, dated July 25, 2013, is attached hereto as Exhibit 2.

5.  A true and correct copy of the Complaint, dated March 7, 2013, filed in the Supreme Court of the State of New York styled *KIRP LLC v. NationStar Mortgage LLC*, Index No. 650794-13 is attached hereto as Exhibit 3.

### A.   TCA's Pre-Litigation Negotiations With Nationstar

6.  By letter dated July 23, 2013, covering transmittal of a draft Complaint, I advised Nationstar of TCA's intention to commence litigation in the Supreme Court of the State of New York unless Nationstar made a good-faith offer of settlement by Friday, July 26, 2013. A true and correct copy of the July 23rd

DECLARATION OF ROBERT PILIERO IN SUPPORT OF
TRUMAN CAPITAL ADVISORS, LP'S MOTION TO DISMISS THE COMPLAINT

letter is attached hereto as Exhibit 4.

7.    Consistent with my representation in that letter, TCA deferred filing the action until that deadline expired.

**B.    The Instant Lawsuit**

8.    While I was waiting to hear from Nationstar regarding whether a settlement was feasible, Nationstar commenced this declaratory judgment action against TCA on July 25, 2013 -- two days after receiving my letter and the draft Complaint, and one day prior to the date counsel indicated was the deadline for a response.

9.    The present declaratory judgment action addresses the same claims as those contained in TCA's draft complaint to Nationstar. No additional claims are asserted.

**C.    The Action by TCA against Nationstar In New York State Court**

10.    In the absence of any communication from Nationstar, on Monday, July 29, 2013, the first business day following the Friday, July 26th deadline, TCA, along with two other plaintiffs, U.S. Bank, National Association as Trustee for the Truman 2012 SC2 Title Trust (the "Trust") and the Trust, commenced litigation against Nationstar in the Supreme Court of the State of New York, County of New York. *See* Exhibit 1.

11.    The action was filed as a "related action" to the KIRP Action and was assigned to the same judge, Justice Eileen Bransten, so that both matters could proceed expeditiously and efficiently.

///

///

///

///

3

DECLARATION OF ROBERT PILIERO IN SUPPORT OF
TRUMAN CAPITAL ADVISORS, LP'S MOTION TO DISMISS THE COMPLAINT

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that his declaration is executed on this /5 day of August, 2013, in New York , New York.

By: _____

Robert Piliero

**DECLARATION OF ROBERT PILIERO IN SUPPORT OF TRUMAN CAPITAL ADVISORS, LP'S MOTION TO DISMISS THE COMPLAINT**

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

TRUMAN CAPITAL ADVISORS LP,
U.S. BANK NATIONAL ASSOCIATION, solely as
LEGAL TITLE TRUSTEE FOR THE TRUMAN
2012 SC2 TITLE TRUST, and as PARTICIPATION
AGENT FOR THE TRUMAN 2012 SC2 TITLE
TRUST, and TRUMAN 2012 SC2 TITLE TRUST

Plaintiffs,

-vs-

NATIONSTAR MORTGAGE, LLC,

Defendant.

Index No. 652 652 / 2013

**COMPLAINT**

---

Plaintiffs Truman Capital Advisors, LP ("TCA"), individually and as Program Manager for the Truman 2012 SC2 Title Trust (the "Trust") and U.S. Bank National Association, solely in its capacity as Legal Title Trustee (the "Legal Title Trustee") and as Participation Agent (the "Participation Agent") for the Trust, through their undersigned counsel, respectfully assert as their Complaint against Nationstar Mortgage, LLC ("Nationstar") as follows:

## NATURE OF THE ACTION

1.      This dispute arises out of Nationstar's repudiation of its agreement to sell to TCA certain residential mortgage loans ("Mortgage Loans") for an agreed price of approximately $150 million. Nationstar offered hundreds of such Mortgage Loans for sale through an on-line auction hosted by its agent, Auction.com. TCA and a number of other investors devoted substantial time and substantial money reviewing the information Nationstar provided regarding the Mortgage Loans it was offering for sale; conducting extensive due diligence regarding the quality and potential value of these hundreds of loans; and participating in the bidding process.

- 1 -

**EXHIBIT 1**
**Page 5**

By the end of that process, acting through its agent, Auction.com, Nationstar had notified and confirmed to TCA that it was the winning bidder with respect to 534 Mortgage Loans.

2.    Within a few days, however, Nationstar, again acting through its agent, Auction.com, notified TCA that Nationstar refused to complete the sale and transfer of the Mortgage Loans covered by TCA's winning bids. Nationstar offered no explanation for this reversal other than to say that it "has made the decision not to go forward with those sales." However, upon information and belief, Nationstar's decision in that regard was based principally, if not solely, on its belated realization that the reserve prices it had set for, and at which it had agreed to sell, the Mortgage Loans to TCA was significantly lower than their fair market value. Nationstar's decision to renege on its commitment to sell the Mortgage Loans to TCA at the agreed price has caused TCA to suffer at least $35 million in damages.

## PARTIES

3.    Plaintiff TCA is a limited partnership with its principal offices located at 200 Business Park Drive, Suite 103, Armonk, New York 10504. TCA sues both in its individual capacity and in its capacity as Depositor's agent.

4.    Plaintiff U.S. Bank National Association is a national banking association. It is qualified to do business in the State of New York and maintains its principal New York offices at 100 Wall Street, New York, NY 10005. U.S. Bank sues only in its capacities as Legal Title Trustee for the Trust and as Participation Agent for the Trust, and not in its individual capacity.

5.    The Trust is a New York common law trust established pursuant to a trust agreement.

6.    Defendant Nationstar is a limited liability company that is a registered Mortgage Banker licensed by the New York Banking Department, with offices located at One State Street, New York, New York 10004.

- 2 -

EXHIBIT 1
Page 6

7.     This Court has personal jurisdiction over Nationstar pursuant to CPLR 301 and 302 because it does business and transacts business in New York.  Venue is properly laid in this Court pursuant to CPLR 503.

## BACKGROUND

8.     TCA acts as an investment manager for institutional investors.  In furtherance of its duties as an investment manager, TCA caused to be created and served as Program Manager for the Trust and acted as the agent of Truman 2012 SC2, LLC ("Depositor").  In its capacity as Depositor's agent, TCA is charged with identifying potential investments in residential mortgage loans and real estate owned properties, providing research and analysis regarding such potential investments, advising on whether to purchase the potential investments, and negotiating and facilitating the purchase of any potential investments for which the decision is made to purchase. Once purchased, title to the residential mortgage loans and real estate owned properties are deposited into the Trust.  As investment manager, TCA was entitled to receive fees for its post-acquisition services that flowed from managing the purchased investments.

9.     Nationstar is a "mortgage servicer" with a nationwide scope of business.  In the context of residential mortgage loans, a mortgage servicer is a company that has full power and authority, acting alone or through sub-servicers, to take any and all actions deemed necessary or appropriate in connection with the administration of mortgage loans that are covered by a Master Servicing Agreement.  Upon information and belief, Nationstar currently services nearly 650,000 mortgages with an aggregate unpaid principal balance of more than $100 billion.

10.     In July 2012, Nationstar purchased the servicing rights as Master Servicer on a large volume of residential mortgage loans.  As part of that transaction, Nationstar assumed all of the rights and obligations of the Master Servicer under Pooling and Servicing Agreements (the

- 3 -

**EXHIBIT 1**
**Page 7**

"PSAs"), including the right to take all actions necessary or appropriate to maximize recoveries on each of the mortgage loans.

11.    Nationstar has publicly acknowledged that among the rights and obligations conferred on it by the governing agreements is the right to sell non-performing loans.

**Nationstar Decides to Sell Non-Performing Loans at Auction**

12.    In or about January 2013, Nationstar engaged Auction.com as its exclusive agent to sell by auction and to conduct a series of Reserve auctions for the sale of a large number of non-performing residential mortgage loans that were to be grouped into "pools" of such loans, with a number of pools to be offered for sale at each of the Reserve auctions contemplated by Nationstar.

13.    An auction is a process used to buy and sell goods and services by offering them for bid, receiving bids, and then selling the item to the highest bidder. The English auction, also known as an open ascending price auction, is believed to be the most common form of auction in use today. Participants openly bid against each other, with each subsequent bid required to be higher than the previous bid. The auction ends when no participant is willing to bid further, at which point the auctioneer announces a sale to the highest bidder, thus creating a binding obligation by the seller to sell and a binding obligation by the successful bidder to buy.

14.    A variation on the English auction is the Reserve auction. In a Reserve auction, the seller may establish a minimum sale, or "reserve," price in advance. If the final bid does not meet or exceed the reserve price, then the item remains unsold.

15.    In all auctions, Reserve or otherwise, the sale is complete when the auctioneer announces the winning bidder. After that announcement, the seller may not withdraw the item and is legally bound to complete the sale to the winning bidder.

-4-

**EXHIBIT 1**
**Page 8**

16.    Auction.com is provider of online real estate auction services.  Upon information and belief, Auction.com has acted as a seller's agent in connection with the sale of approximately $20 billion worth of property since 2007.

17.    On or about January 23, 2013, Auction.com published Reserve Auction Terms and Conditions ("Auction Terms") that would govern all the online auctions that it would conduct for Nationstar.  A true copy of the Auction Terms is annexed hereto as Exhibit 1, and its provisions are incorporated herein.

18.    The Auction Terms provided that due diligence records would be made available for each Note in a secure data vault, and that all bidders would be required to fully complete their due diligence on each Note before bidding, including a review of the records in the data vault.

19.    On or about January 23, 2013, as required by the Auction Terms, TCA, acting as Depositor's agent, submitted an online registration which enabled it to participate as a bidder in the auctions of Mortgage Loans to be offered for sale by Nationstar.

20.    On or about January 31, 2013, TCA, acting as Depositor's agent, began its detailed financial review of each Note as part of its due diligence.  That review included, but went far beyond, the records that Nationstar had electronically deposited in the data vault. ·

**KIRP Objects to the Sale of Some of the Mortgage Loans**

21.    On February 5, 2013, non-party KIRP LLC ("KIRP") wrote a letter to Nationstar expressing concern about Nationstar's stated intention to auction any Mortgage Loans (the "Challenged Mortgage Loans") that were collateral for the certificates issued by six residential mortgage-backed security trusts sponsored by Residential Accredit Loans, Inc. (the "RALI Trusts"), in which KIRP had a financial interest.  In the letter, KIRP asserted that Nationstar lacked authority to sell the Challenged Mortgage Loans under the terms of the applicable Servicing Agreements.

- 5 -

**EXHIBIT 1**
**Page 9**

22.     The substantial majority of the Mortgage Loans included in the auction were not sponsored by the RALI Trusts, and KIRP had no financial interest in them.

23.     Upon information and belief, Nationstar did not respond to KIRP's letter, nor did it remove the Challenged Mortgage Loans from the pool of Mortgage Loans it was offering for sale.

24.     Nationstar did not inform TCA or, upon information and belief any of the entities that had registered to participate in the auction, about KIRP's letter, its objections or its assertion that Nationstar lacked the legal right to sell the Challenged Mortgage Loans.

25.     Unaware of KIRP's objection to the sale of the Challenged Mortgage Loans, TCA continued its detailed due diligence review of 636 Mortgage Loans that it was interested in purchasing on behalf of Depositor. That review included, but went far beyond, the records Nationstar had electronically deposited in the data vault.

**TCA is the Winning Bidder on 304 Mortgage Loans**

26.     Nationstar did not remove the Challenged Mortgage Loans from the auction while it was in progress.

27.     At no time while the auction was in progress did Nationstar inform TCA, or upon information and belief any of the other registered bidders, about KIRP's claim regarding the Challenged Mortgage Loans.

28.     On or about February 21, 2013, after completing its extensive due diligence review, TCA timely placed bids, in multiple pools, on 480 of the Mortgage Loans offered for sale. Although unknown to TCA, some of the 480 Mortgage Loans on which it had submitted bids were Challenged Mortgage Loans

**EXHIBIT 1**
**Page 10**

29.    At the conclusion of the auction, Auction.com confirmed in writing that TCA was the winning bidder with respect to multiple pools totaling 304 Mortgage Loans. The winning bid price was approximately $94,045,115.

30.    The auctioneer's announcement that TCA had won these Mortgage Loans created a binding obligation for Nationstar to sell the 304 Mortgage Loans at the agreed price. Although unknown to TCA, some of these Mortgage Loans were Challenged Mortgage Loans.

**Nationstar's Auction Sale Continues**

31.    On or about February 19, 2013, Auction.com announced that Nationstar's sale of non-performing Mortgage Loans would continue in another two-day Reserve auction, covering additional pools of Mortgage Loans to be sold by Nationstar, under the same Auction Terms as the first auction of Mortgage Loans on behalf of Nationstar, and pursuant to the same online registration that TCA had already submitted.

32.    Auction.com's announcement did not disclose that the Mortgage Loans to be offered for sale included certain Challenged Mortgage Loans, the sale of which KIRP had objected to two weeks earlier.

33.    As had occurred in connection with Nationstar's earlier auction, due diligence records were made available to registered bidders in a secure data vault.

34.    From on or about February 22, 2013 through about March 4, 2013, TCA, as Depositor's agent, conducted its detailed due diligence financial review of each of the 547 Mortgage Loans that formed a part of this auction. That review included, but went far beyond, the records Nationstar had electronically deposited in the data vault.

35.    Following the due diligence review, TCA, as Depositor's agent, decided to bid on pools encompassing 346 of the 547 Mortgage Loans it had reviewed.

- 7 -

**EXHIBIT 1**
**Page 11**

**KIRP Renews Its Objections**

36.     Upon information and belief, on March 4, 2013, KIRP, through its attorney, again notified Nationstar of its objection to the auction based on its assertion that Nationstar did not have the legal right to sell non-performing loans that formed part of the collateral for the RALI Trusts.

37.     Upon information and belief, on March 5, 2013, Nationstar's attorney responded to the March 4, 2013 letter from KIRP's attorney, stating that Nationstar would not respond before March 7, 2013, which was the day after the Second Auction was scheduled to end.

38.     Upon information and belief, on March 5, KIRP asked Nationstar to agree to a "standstill" period of five days during which Nationstar would not transfer, convey, or sell any loans that had been subject to auction through Auction.com, and to refrain from commencing any new auctions during that time. Upon information and belief, Nationstar did not respond to this request.

39.     Nationstar did not remove the Challenged Mortgage Loans from the second round of the auction while it was in progress. At no time during the two days in which this second round of the auction was in progress did Nationstar inform TCA, or upon information and belief any of the other registered bidders, about KIRP's claim regarding the Challenged Mortgage Loans.

40.     On March 6, 2013, after completing its due diligence review, TCA placed bids in multiple pools on 346 of the 547 Mortgage Loans offered for sale. Unknown to TCA, some of the 346 Mortgage Loans on which it had submitted bids were Challenged Mortgage Loans.

41.     At the conclusion of the auction, Auction.com confirmed in writing that TCA was the winning bidder with respect to multiple pools totaling 234 Mortgage Loans. The winning bid price was approximately $55,312,005.

- 8 -

EXHIBIT 1
Page 12

42.     The auctioneer's announcement that TCA had won these Mortgage Loans created a binding obligation for Nationstar to sell the 234 Mortgage Loans to at the agreed price. Unknown to TCA, some of these Mortgage Loans were Challenged Mortgage Loans.

## KIRP Commences Litigation

43.     On March 7, 2013, KIRP commenced an action in the Supreme Court of the State of New York, County of New York, styled *KIRP, LLC v. Nationstar Mortgage, LLC*, Index No. 650794/13 (the "KIRP Action").

44.     On the same day, KIRP sought and was granted a Temporary Restraining Order ("TRO") enjoining the sale of "any non-performing mortgage loans collateralizing the certificates issued by the RALI Trusts that ha[d] already been auctioned through www.auction.com or other similar websites." As such, the TRO applied solely to the Challenged Mortgage Loans. Among the allegations made by KIRP in its Complaint and submissions in support of its application for a TRO were assertions that Nationstar was offering the Mortgage Loans at substantial discounts—some as much as or more than 50%— below their fair market value.

## Nationstar Refuses to Sell TCA Any of the Mortgage Loans

45.     Only about 20% of the Mortgage Loans that Nationstar had agreed to sell to TCA are Challenged Mortgage Loans as to which KIRP had any claim and which were subject to the TRO. Nonetheless, on March 15, 2013, Auction.com notified TCA that Nationstar had decided renege on its agreement to sell **all** the Mortgage Loans as to which TCA had been the winning bidder.

46.     On April 22, 2013, the Supreme Court dissolved the TRO on the stipulation of KIRP and Nationstar.

- 9 -

**EXHIBIT 1**
**Page 13**

47.    In the KIRP Action, Nationstar has judicially admitted that the "unambiguous terms" of the applicable mortgage servicing agreements "expressly permitted" it to sell the non-performing Mortgage Loans offered for sale at the auction.

48.    Since dissolution of the TRO, and in an effort to avoid litigation, TCA has again asked Nationstar to complete the sale.

49.    To this day, Nationstar still refuses to honor its obligations to TCA, and has informed TCA that it will not complete the sale of the Mortgage Loans, even as to the 80-85% of the Mortgage Loans that are not subject to the *KIRP* litigation.

50.    As a result, Depositor has authorized TCA to sue Nationstar in TCA's name to protect and enforce the rights of Depositor, as TCA's principal, with regard to the Mortgage Loans.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

51.    TCA repeats all of the foregoing allegations as though fully set forth herein.

52.    Nationstar and TCA entered into valid, binding and enforceable agreements for the sale of 538 Mortgage Loans for an aggregate purchase price of $149,357,120.

53.    Nationstar has, without legal excuse or justification, refused to perform its obligation to complete the sale of the Mortgage Loans to TCA for the agreed upon price, despite due demand from TCA.

54.    TCA has fully and faithfully performed its own obligations or was otherwise excused from performance of those obligations by Nationstar's agent, Auction.com, or because of Nationstar's failure to perform.

- 10 -

**EXHIBIT 1**
**Page 14**

55.     As a direct, foreseeable, proximate, and inevitable result of Nationstar's breach, TCA and the Trust have sustained injury and damages in an amount not yet capable of precise ascertainment but believed to be in excess of $35 million.

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

56.     TCA repeats all of the foregoing allegations as though fully set forth herein.

57.     In the alternative, if Nationstar's refusal to complete the sale of the Mortgage Loans to TCA does not constitute a breach of contract, then TCA and the Trust are entitled to relief under the doctrine of promissory estoppel because TCA reasonably relied to its detriment on promises and assurances made by Nationstar through its duly authorized agent, Auction.com, that Nationstar would sell 538 Mortgage Loans for an aggregate purchase price of $149,357,120.

58.     As a direct, foreseeable, proximate, and inevitable result of Nationstar's promises and TCA's reasonable reliance thereon, TCA and the Trust have suffered injury and damages in an amount in an amount not yet capable of precise ascertainment.  Under California law, made applicable by the Auction Terms, TCA and the Trust are entitled to recover from Nationstar an amount equal to the amount that would be recoverable for breach of contract, but in no event less than the amount of costs directly incurred by TCA in reliance on Nationstar's promise to sell the Mortgage Loans to the winning bidder.

- 11 -

EXHIBIT 1
Page 15

**WHEREFORE**, TCA, the Legal Title Trustee and the Participation Agent, on behalf of the Trust, respectfully request entry of Judgment against Nationstar in an amount to be determined at trial, but believed to be in excess of $35 million, as well as all costs and expenses, including without limitation reasonable attorneys' fees, incurred by TCA, the Legal Title Trustee and the Participation Agent, on behalf of the Trust, in this action.

Dated: New York, New York
July 29, 2013

Respectfully submitted,

**BUTZEL LONG,** a professional corporation

By: _____
Robert D. Piliero
Regina M. Alter
380 Madison Avenue
New York, New York 10017
(212) 818-1110
piliero@butzel.com
alter@butzel.com

*Attorneys for Plaintiffs*

- 12 -

**EXHIBIT 1**
**Page 16**

Exhibit 1

EXHIBIT 1
Page 17



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

| SUMMARY OF KEY TERMS: | |
| --- | --- |
| INITIAL BIDDING DEPOSIT: | $5,000 Minimum per Pool – Please see Auction Registration Page for specifics |
| BUYER'S PREMIUM: | Greater of (i) 5% of the Winning Bid Amount or (ii) $10,000* |
| EARNEST MONEY DEPOSIT: | Greater of (i) 10% of the Total Purchase Price or (ii) $20,000 |

The Auction will be conducted by Auction.com ("Auctioneer"). Auctioneer, as used in these Terms and Conditions, shall include but not be limited to, any and all of its agents, employees, representatives, officers and directors. These Terms and Conditions generally describe the Auction of a pool of notes secured by real properties (individually, a "Note" and collectively, the "Notes") owned by one or more selling entities ("Seller" herein shall include the selling entity and its parent company, subsidiaries, or affiliated companies). The Sellers of the Notes listed have instructed Auctioneer to auction the listed Notes on the Terms and Conditions set forth below. Terms and Conditions may vary among the Notes in each Auction, so please review the Terms and Conditions for each Note carefully. Prospective purchasers who register in accordance with the instructions below will be deemed "Bidders" during the Auction. Winning Bidders (each a "Winning Bidder") will be required to execute loan sale documentation in a form and with terms and provisions required by Seller (the "Loan Sale Agreement"), which Loan Sale Agreement will incorporate many of these Terms and Conditions. The Loan Sale Agreement is posted at www.auction.com and is not negotiable.

## 1. REGISTRATION

Registration is required in order to bid online during the Auction and there is no fee to register. In order to register for the Auction, please go to www.auction.com, click on the "Online Bidding" tab and follow the registration instructions. As part of the registration process, you will be required, on a per Note basis, to (i) have a credit card authorization issued or make a refundable deposit by wire transfer or cashiers check to a third party escrow holder for the Initial Bidding Deposit, the amount of which shall be set forth for each particular Note on the auction registration page for such Note and (ii) for private investors (e.g. non-institutional), show proof of readily available funds in the form of bank statements and/or investment account (stocks/bonds) statements (dated within sixty (60) days). Any questions regarding qualification shall be directed to Seller's loan sale advisor as other qualification conditions may be required by Seller. Following registration approval, private investor Bidders may be required to provide, upon request, additional proof of readily available funds and/or an additional Initial Bidding Deposit amount to bid or continue bidding. In the event bidding has begun, then Auctioneer may suspend, in its sole discretion, any further bidding by Bidder until additional proof of funds and/or an additional Initial Bidding Deposit amount is confirmed by Auctioneer. Please ensure you register as a bidder in the name of the person or the entity that will be the buyer in the event your bid is the winning bid. Only the name of the registered bidder who has received final registration approval will be permitted on the loan sale documentation. If you are registering to bid as anything other than a natural person, you will be required to provide the necessary legal documentation evidencing good standing as an entity, which documentation may include the Articles of Incorporation or Organization, a Certificate of Good Standing issued within forty-five (45) days, ByLaws, Resolutions, Operating Agreement, Partnership Agreement, Trust document or other legal documentation evidencing the legal existence of the bidder as may be requested by the Auctioneer. Please follow the instructions on the website carefully to make sure you obtain final registration approval, which approval confirmation will be sent by e-mail to you and will allow you to bid online during the Auction. We highly recommend registering well in advance of the Auction to enhance your chances of being notified of any changes that may take place prior to Auction day. Individuals from outside the United States may register to bid online.

EXHIBIT 1
Page 18



## RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

### ONLINE ONLY BIDDING

### 2. DUE DILIGENCE

Each Note will have due diligence documents available for viewing in a secure data vault at *www.auction.com*. A confidentiality agreement will be required to be acknowledged and agreed to prior to entering the data vault. All Bidders must fully complete their Note due diligence prior to bidding, including reviewing the information contained in the data vault. No Bidder shall enter onto the premises or into the property secured by the Note or contact any borrower or any occupants or tenants of the underlying property without the authorization of the Seller, however viewing the property without entering onto the premises is permissible.

### 3. ONLINE BIDDING AND BUYING

Reserve Auction. This is a reserve auction and all Notes have a reserve price ("Reserve Price"), meaning the Seller of each Note can accept or reject any bid and has also established an unpublished, minimum selling price. The starting bid is not the Reserve Price. In order to become the Winning Bidder for a Note, a Bidder must meet or exceed the Reserve Price and the bid must be accepted by the Seller (see "Subject to Confirmation" section below). Except where prohibited by law, during a live bidding event (online or otherwise) the Auctioneer may open bidding on any Note by placing a bid on behalf of the Seller and may further bid on behalf of the Seller, up to the amount of the Reserve Price, by placing successive or consecutive bids for a Note, or by placing bids in response to other bidders. If no bidders meet the Reserve Price, the Seller is under no obligation to sell the Note. The Seller may withdraw a Note at any time prior to the announcement of the completion of the sale by the Auctioneer. Auctioneer is not acting as an agent for any Bidder in any capacity, and is acting exclusively as the Seller's agent as an auctioneer.

Buyer's Premium and Total Purchase Price. The purchase price will include a buyer's premium equal to the greater of five percent (5%) of the winning bid amount or $10,000 (*unless otherwise specified in the specific property listing or Loan Sale Agreement). Please check the Property details page at *www.auction.com* regarding Property specific terms. In the event the Seller is selling Notes that are in conjunction with a purchase option, then the buyer's premium may be paid separately from the purchase price by Buyer to Auctioneer, all as set forth in such Loan Sale Agreement. The total purchase price may also include escrow and reserve accounts (the "Total Purchase Price"), but does not include other amounts payable by the Buyer during closing, such as escrow/closing fees, etc. Please review the Loan Sale Agreement for specific details.

Bidding and Winning. The bidder authorization and log-in information given to you upon successfully registering to bid online shall be used by you during the Auction to bid on Notes. To purchase a particular Note at the Auction, one must be acknowledged by the Auctioneer as the Winning Bidder (the bidder to whom the Auctioneer acknowledges the Note as being "SOLD" to), and such Note is not identified as being sold "Subject to Confirmation" (see below). If you are the Winning Bidder, you will be contacted by phone by an Auctioneer representative at the phone number you provided during registration. Once contacted by an Auctioneer representative, the Winning Bidder will be sent, by e-mail, the Loan Sale Agreement and certain other documents for electronic signature, unless otherwise directed by Seller. The Loan Sale Agreement will contain the exact terms and conditions of the sale. As between Winning Bidder and Seller, the Loan Sale Agreement supersedes any and all other documents or information (including without limitation these Terms and Conditions) and serves as the governing document for the sale of each Note. After executing the Loan Sale Agreement electronically, which shall be executed within two (2) hours of Auctioneer's acknowledgment of the winning bid, Winning Bidder will be contacted by an escrow/closing agent or settlement attorney, who will provide them certain additional information pertaining to the closing process.

If a Winning Bidder cannot be reached within two (2) hours of Auctioneer's acknowledgment of the winning bid, or Winning Bidder fails to electronically execute the purchase documentation within two (2) hours of Auctioneer's acknowledgment of the winning bid, then Auctioneer or Seller can declare the Winning Bidder to be in default. In the event of such declaration, the Winning Bidder's bid shall be null and void and the Auctioneer and Seller shall have absolutely no further liability or obligation to that Bidder. IN ADDITION, SUCH WINNING BIDDER SHALL BE SUBJECT TO LIQUIDATED DAMAGES EQUAL TO TEN PERCENT (10%) OF THE PURCHASE PRICE AND AUCTIONEER AND SELLER

EXHIBIT 1
Page 19



### RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

#### ONLINE ONLY BIDDING

RESERVE THE RIGHT TO SEEK ANY AND ALL OTHER REMEDIES, INCLUDING SPECIFIC PERFORMANCE. Additionally, Seller shall have the right to retain the Initial Bidding Deposit as part of the liquidated damages. Furthermore, Auctioneer and Seller reserve the right to immediately put the Note back up for sale.

In order to allow final bids to be properly input and processed, the Auctioneer may extend the close of bidding for any Note in certain time increments to allow for additional bids. Once an extension of time has elapsed with no additional, higher bids, then the bidding will be closed.

Subject to Confirmation. In the event the winning bid amount is not immediately accepted by the Seller, the Auctioneer will inform the Winning Bidder that acceptance of their winning bid is "subject to confirmation." Winning Bidder acknowledges and agrees that Winning Bidder's purchase is subject to, and contingent upon, the Seller approving the purchase, which shall be given or denied at their sole and absolute discretion within five (5) business days following the close of the Auction and execution of the Loan Sale Agreement by the Winning Bidder. For certain assets, different timeframes may apply, please review the www.auction.com website and the purchase documentation for further information. The Winning Bidder shall be required to provide loan level pricing upon the execution of the Loan Sale Agreement. Seller shall at its sole discretion be able to approve or reject the contract individually with respect to each loan. Winning Bidder will receive a refund of monies deposited in the event Seller chooses not to accept the bid.

Payment of Deposit and Remaining Balance. As the Earnest Money Deposit, Winning Bidder shall be required to pay an amount equal to the greater of (i) ten percent (10%) of the Total Purchase Price or (ii) $20,000 on any Note purchase (unless otherwise specified in the loan sale documentation). The Earnest Money Deposit must be made no later than twenty-four (24) hours following the close of the auction (including Notes sold "subject to confirmation"). All monies will be immediately deposited with an escrow/closing agent or settlement attorney and shall be released to the Seller within twenty-four (24) hours following receipt by the escrow/closing agent of the deposit and the fully executed Loan Sale Agreement. The balance of the Total Purchase Price, along with all other costs and/or fees, must be paid as required in the Loan Sale Agreement.

If Winning Bidder fails to deliver the Earnest Money Deposit within twenty-four (24) hours following the close of the Auction, then Auctioneer or Seller can declare the Winning Bidder to be in default. IN SUCH EVENT, THE WINNING BIDDER SHALL BE SUBJECT TO LIQUIDATED DAMAGES EQUAL TO TEN PERCENT (10%) OF THE PURCHASE PRICE AND AUCTIONEER AND SELLER RESERVE THE RIGHT TO SEEK ANY AND ALL OTHER REMEDIES, INCLUDING SPECIFIC PERFORMANCE. Any further liability resulting from such default by Winning Bidder shall be controlled by the terms of the Loan Sale Agreement. Additionally, Seller shall have the right to retain the Initial Bidding Deposit as part of the liquidated damages.

Closing. All sales are expected to close with a national or regional escrow/closing firm within ten (10) business days of the close of the auction (fifteen (15) business days of the close of the auction for accepted "subject to confirmation" bids) or as set forth in the Loan Sale Agreement. Winning Bidders shall be required to pay all closing costs, including, but not limited to, escrow/closing fees, title fees and costs, recording fees, normal prorations, document preparation fees, and all documentary transfer taxes (or other taxes) as applicable and as set forth in the Loan Sale Agreement. Winning Bidders also may be required to pay additional fees and costs as provided in the Loan Sale Agreement.

Extensions. In certain cases, the Seller may grant an extension of the closing date, the terms and conditions of which are set forth in the Loan Sale Agreement. The Seller may require Buyer to pay a fee for such extension. This fee WILL NOT be credited towards the Total Purchase Price. All extension requests are evaluated by the Auctioneer and Seller on a case-by-case basis and may be granted or denied in their sole and absolute discretion.

Conveyance. Except as may be set forth in the Loan Sale Agreement, the Note will be assigned with a lender's title policy ensuring the Note's secured position, subject to standard title exclusions and exceptions and subject to the terms and conditions set forth in the Loan Sale Agreement. Bidder understands and agrees that neither Seller no Auctioneer makes any representations or warranties regarding the status of real estate taxes, liens, utility charges or other monetary

**EXHIBIT 1**
**Page 20**



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

encumbrances affecting the property securing the Note. Bidder further understands and agrees and that it is the sole responsibility of Bidder to determine the status of real estate and personal property taxes, liens, utility charges or other monetary encumbrances that may be assessed against the property securing the Note, and neither Seller nor Auctioneer shall have any responsibility whatsoever with respect to payment of same.

### 4. PAYING FOR YOUR PURCHASE

No financing will be made available for the Auction. All purchases will be cash only. <u>NO</u> financing contingency shall be applicable to any Notes in the auction. Auctioneer does not provide lending or financial services.

### 5. FINDER'S FEE

A finder's fee, based on the winning bid amount, may be available on the Notes for which these Terms and Conditions are applicable and paid to individuals: (i) who have submitted a finder's fee registration form ("Finder's Fee Registration Form") (contact the loan sale advisor) at least twenty-four (24) hours prior to the start of the auction (the "Qualification Deadline"), (ii) whose client/Bidder successfully purchases a Note for which the finder's fee applies and the transaction closes, and (iii) who has satisfied all other requirements set forth herein. Please check the website for specific finder's fee amounts, if any, related to specific Notes. THERE WILL BE NO FINDER'S FEE REGISTRATION PERMITTED AFTER THE QUALIFICATION DEADLINE. THERE ARE NO EXCEPTIONS TO THE QUALIFICATION RULES.   Please verify whether a finder's fee is applicable by checking the asset detail listing page.

To qualify for and earn a finder's fee, brokers/agents must:

1.   Fully complete the Finder's Fee Registration Form, including the execution by your client/Bidder acknowledging your representation of such client/Bidder, and ensure that when your client/Bidder registers for the Auction, that they include your information as part of their registration;

2.   Have a valid and active real estate broker or salesperson license and provide assistance to your client during the due diligence period;

3.   Execute the loan sale documentation by electronic means, along with your client, within 24 hours of the client receiving the emailed documentation signing link. If you fail to sign the loan sale documentation within the time prescribed, you shall not be entitled to any finder's fee. Finder's fees will be earned and paid upon closing; and

4.   Provide the Escrow/Closing Agent with an IRS Form W-9 or electronically complete an IRS Form W-9 in order to receive a finder's fee.

5.   No finder's fee will be paid to a person or entity (a) acting as a principal in the purchase of any Note, (b) that is a director, employee, manager, or member of the client/bidder, or an affiliate of such client/bidder, or (c) is an immediate family member (defined as a spouse, parent, sibling, or child including in-law relationships) of such client/bidder.

### 6. GENERAL AUCTION INFORMATION

Sellers and Auctioneer reserve the right to deny any person the ability to bid and/or access to the online bidding platform for any reason. Seller and Auctioneer have the right to postpone or cancel the Auction, to withdraw any Note from the Auction and to change any terms of the Auction or particular conditions of sale upon announcement prior to or during the course of the Auction. In the event of a dispute among Bidders, the Auctioneer shall make the sole and final decision to either accept the final bid or to re-offer and resell the Note in dispute.

**EXHIBIT 1**
**Page 21**



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

The respective rights and obligations of the parties with respect to these Auction Terms and Conditions and the conduct of the Auction shall be governed by, interpreted and enforced under the laws of the state of California. By bidding in the Auction by the Internet, each Bidder shall be deemed to have irrevocably submitted to the courts of competent jurisdiction in Orange County, California (including the federal courts) in connection with any suit, proceeding or other legal process relating to the Auction and/or the offering or sale of any Note. Upon execution of the Loan Sale Agreement, all rights and remedies with respect to the Note covered by such Loan Sale Agreement shall be governed by such Loan Sale Agreement.

Offers made during the Auction are void where prohibited by law. Any information on any website, in any brochure, e-mail or postcard and any and all information available regarding the Notes shall not constitute an offer to sell or a solicitation of any offer to buy any of the Notes referenced herein. In addition, and without limitation of the foregoing, any website or brochure shall not constitute an offer to sell or a solicitation of any offer to buy nor shall there be any sales of any of the Notes in any state in which such offer, solicitation, or sale would be unlawful prior to the registration or qualification under the applicable securities laws of that state. No obligation to sell shall be binding on Seller unless and until a written contract of sale or loan sale agreement is signed and delivered by Seller. Seller reserves the right to rescind any oral acceptance of a winning bid prior to the execution and delivery of an executed contract of sale or loan sale agreement for any reason.

## 7. DISCLAIMER

Neither Seller nor Auctioneer makes any representations or warranties as to the accuracy or completeness of any information contained online at the Auction website or made available by the Seller or Auctioneer. All prospective purchasers are required and encouraged to conduct their own due diligence and investigate all matters relating to the Notes that they are interested in purchasing in the Auction. Online bidding is provided on an "as is, as available" basis. No warranties, expressed or implied, including, but not limited to, those of merchantability or fitness for a particular purpose, are made with respect to the online bidding platform or any information or software therein.

Neither Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, those caused by any failure of performance, error, omission, interruption, defect, delay in operation of transmission, computer virus, or line failure. Neither Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, special or consequential damages that result from the use of, or the inability to use, the website, the materials on the website, or the online bidding platform even if there is negligence or Auctioneer or an authorized Auctioneer representative has been advised of the possibility of such damages, or both. The above limitation or exclusion may not apply to you to the extent that applicable law may not allow the limitation or exclusion of liability for incidental or consequential damages. Seller's, or Auctioneer's total liability to you for all losses, damages, and causes of action (in contract, tort (including without limitation, negligence), or otherwise) will not be greater than the amount you paid to access this site.

"AS IS, WHERE IS AND WITH ALL FAULTS". ALL OF THE NOTES WILL BE SOLD BY SELLER AND AUCTIONEER "AS IS, WHERE IS AND WITH ALL FAULTS" AS MORE PARTICULARLY DESCRIBED IN THE LOAN SALE AGREEMENT. ALL PROSPECTIVE PURCHASERS/BIDDERS ACKNOWLEDGE AND AGREE THAT SELLERS AND AUCTIONEER HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATE AND DISCLAIM ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, CONCERNING OR WITH RESPECT TO THE NOTES. EACH PROSPECTIVE PURCHASER/BIDDER AND ANYONE CLAIMING BY, THROUGH OR UNDER THE SAME HEREBY FULLY AND IRREVOCABLY RELEASES SELLERS AND AUCTIONEER, THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, TRUST MANAGERS, REPRESENTATIVES, ATTORNEYS, BROKERS AND AGENTS ("REPRESENTATIVES") FROM ANY AND ALL CLAIMS THAT HE/SHE/IT OR THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLERS, AUCTIONEER AND THEIR REPRESENTATIVE FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATING TO ANY ERRORS, OMISSIONS OR OTHER CONDITIONS AFFECTING THE NOTES. THIS RELEASE INCLUDES CLAIMS OF WHICH PROSPECTIVE PURCHASER/BIDDER IS PRESENTLY UNAWARE OR DOES NOT PRESENTLY SUSPECT TO EXIST IN HIS/HER/ITS FAVOR WHICH, IF KNOWN BY PROSPECTIVE PURCHASER/BIDDER, WOULD MATERIALLY AFFECT

EXHIBIT 1
Page 22



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

PROSPECTIVE PURCHASER'S/BIDDER'S RELEASE OF SELLERS AND AUCTIONEER. EACH PROSPECTIVE PURCHASER/BIDDER SPECIFICALLY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, AND OTHER APPLICABLE STATE STATUTES WHICH PROVIDE AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

By registering for the Auction, Bidder agrees to these Terms and Conditions, as may be updated from time to time prior to the Auction. Such form of acceptance by Bidder is binding and Bidder acknowledges it shall be binding and enforceable pursuant to the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("UETA") and applicable state laws.

01232013 POOL

Page | 6

**EXHIBIT 1
Page 23**

| From: | efile@courts.state.ny.us |
| Sent: | Thursday, August 01, 2013 3:44 PM |
| To: | Piliero, Robert |
| Subject: | NYSCEF New York RJI -RE: OTHER(SPECIFY IN DESCRIPTION AREA), 652652/2013, TRUMAN CAPITAL ADVISORS LP et al - v. - NATIONSTAR MORTGAGE, LLC |

## Supreme Court Document Approval

On 08/01/2013 at 3:44:11 PM, the document below was approved.

| Case/Claim number | 652652/2013 |
| Caption | TRUMAN CAPITAL ADVISORS LP et al - v. - NATIONSTAR MORTGAGE, LLC |
| Judge Assigned | Eileen Bransten |
| Date Received | 07/30/2013 |
| Filer | ROBERT PILIERO (piliero@butzel.com) |
| Comments | assigned judge |
| Document number | 4 |
| Document type | RJI -RE: OTHER(SPECIFY IN DESCRIPTION AREA) |
| Description | RJI - requesting assignment of Commercial Division |
| Special Instructions | |

https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=7TFWLCi88E349k3z4y9K4Q==&
system=prod

If the document does not display after clicking the hyperlink, cut and paste the entire hyperlink into your browser.

---

THIS E-MAIL IS INTENDED ONLY FOR THE USE OF THE NAMED ADDRESSEE(S) AND FOR THE
PURPOSES OF THE ELECTRONIC FILING SYSTEM. IF YOU ARE NEITHER THE INTENDED
RECIPIENT NOR A PERSON DESIGNATED TO RECEIVE MESSAGES ON BEHALF OF THE
INTENDED RECIPIENT, PLEASE NOTIFY THE SENDER IMMEDIATELY. THANK YOU.

**EXHIBIT 1
Page 24**

# EXHIBIT 2

JOHN B. SULLIVAN (State Bar No. 96742)
jbs@severson.com
MARK D. LONERGAN (State Bar No. 143622)
mdl@severson.com
ERIK KEMP (State Bar No. 246196)
ek@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Plaintiff NATIONSTAR
MORTGAGE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

| | |
|---|---|
| NATIONSTAR MORTGAGE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>TRUMAN CAPITAL ADVISORS, LP, a limited partnership<br><br>Defendant. | Case No. **SACV13 - 01114 RNB**<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff Nationstar Mortgage, LLC alleges as follows:

**Jurisdiction and Venue**

1.     This is an action for declaratory relief under 28 U.S.C. §§ 2201, 2202. This Court has jurisdiction over this case under 28 U.S.C. § 1332(a).  This suit is between citizens of different states.  The amount in controversy exceeds $75,000, exclusive of costs and interest.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1).  The defendant "resides" in this judicial district, as "reside" is defined in 28 U.S.C. § 1391(c).

11951.0000/2807813.1

Complaint for Declaratory Relief

**EXHIBIT 2**
**Page 25**

**Parties**

3.    Nationstar is a Delaware limited liability company that is authorized to do business in the state of California. Nationstar's members are Nationstar Sub1 LLC and Nationstar Sub2 LLC. Nationstar Sub1 LLC and Nationstar Sub2 LLC are limited liability companies that are wholly owned by Nationstar Mortgage Holdings, Inc., a Delaware corporation, with its principal place of business in Lewisville, Texas. Accordingly, Nationstar is a citizen of Delaware and Texas.

4.    Defendant Truman Capital Advisors LP ("TCA") is a Delaware limited partnership. TCA agreed that certain Reserve Auction Terms and Conditions (the "Auction Terms") would govern any claims arising out of the facts alleged in this complaint and that suit would be proper in any state or federal court located in Orange County. A true copy of the Auction Terms is attached as Exhibit A. On information and belief, TCA is not a citizen of the state of Delaware or Texas, but instead of the state of New York. According to the "Uniform Application for Investment Adviser Registration" that TCA submitted to the U.S. Securities and Exchange Commission, TCA is a limited partnership with two partners. Its two partners are Trucap Advisors, LLC and Savannah Capital, LLC. Trucap Advisors, LLC and Savannah Capital, LLC are owned by Mitchell D. Samberg. Mr. Samberg resides in and is a citizen of the state of New York. TCA is therefore a New York citizen for diversity purposes.

5.    This case involves an actual controversy, within the Court's subject matter jurisdiction. A judicial declaration is necessary regarding the rights, duties and legal relations between Nationstar and TCA for the reasons stated below. The declaratory relief Nationstar requests is authorized by 28 U.S.C. §§2201, 2202 and Fed. R. Civ. P. 57.

**Facts**

6.    Nationstar is a servicer of home loans. It services home loans on behalf of the loans' owners or investors.

11951.0000/2807813.1                                    2

Complaint for Declaratory Relief

EXHIBIT 2
Page 26

7.    Nationstar engaged Auction.com to sell by reserve auction certain home loans that Nationstar serviced subject to pooling and servicing agreements (the "Loans").

8.    Auction.com published the Auction Terms, which govern the online auctions of the Loans.

9.    On information and belief, TCA registered with Auction.com as a bidder to participate in the auction of the Loans.  In so registering, TCA agreed to be bound by the Auction Terms.

10.    On information and belief, TCA bid through Auction.com to purchase 304 Loans for the price of $94,045,115.

11.    On information and belief, TCA later bid through Auction.com to purchase an additional 234 Loans for the price of $55,312,005.

12.    The Auction Terms provide that "[n]o obligation to sell shall be binding on Seller unless and until a written contract of sale or loan sale agreement is signed and delivered by Seller.  Seller reserves the right to rescind any oral acceptance of a winning bid prior to the execution and delivery of an executed contract of sale or loan sale agreement for any reason."

13.    Nationstar is the "Seller" under the Auction Terms.

14.    Nationstar did not enter into or execute a written agreement with TCA to sell any of the Loans TCA bid on through Auction.com.

15.    Nationstar has exercised its right to rescind any acceptance of a winning bid of the Loans that TCA bid on through Auction.com.  Nationstar has informed TCA that it has exercised such right.

16.    TCA contends it was the winning bidder for 538 Loans it bid on through Auction.com and that Nationstar is obliged to sell those Loans to it.  TCA contends Nationstar is not entitled to rescind the alleged sale of the Loans.

17.    TCA has made demand upon Nationstar and stated it intends to sue Nationstar for breach of contract and promissory estoppel arising out of its claim

11951.0000/2807813.1                           3

Complaint for Declaratory Relief

EXHIBIT 2
Page 27

that Nationstar is allegedly obligated to sell the Loans TCA bid upon. TCA further contends it is entitled to recover damages from Nationstar in excess of $75,000.

18. The Auction Terms provide that "[n]either Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, those caused by any failure of performance, error, omission, interruption, defect, delay in operation of transmission, computer virus, or line failure. Neither Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, special or consequential damages that result from the use of or the inability to use, the website, the materials on the website, or the online bidding platform even if there is negligence or Auctioneer or an authorized Auctioneer representative has been advised of the possibility of such damages, or both. The above limitation or exclusion may not apply to you to the extent that applicable law may not allow the limitation or exclusion of liability for incidental or consequential damages. Seller's, or Auctioneer's total liability to you for all losses, damages, and causes of action (in contract, tort (including, without limitation, negligence) or otherwise) will not be greater than the amount you paid to access this site."

19. TCA's demand exceeds the amount TCA paid to access Auction.com's website. Accordingly, assuming Nationstar were liable to TCA for breach of contract or promissory estoppel, which Nationstar denies, the amount owed could not be more than the amount TCA paid to access Auction.com's website.

## FIRST CLAIM FOR RELIEF

## (DECLARATORY RELIEF)

20. Nationstar realleges and incorporates paragraphs 1-19 above.

21. An actual controversy has arisen and now exists between Nationstar and TCA as to their respective rights and duties with regard to TCA's attempt to purchase certain Loans through Auction.com's website.

22. Nationstar contends it never entered into or executed a written agreement to sell TCA any of the Loans and it is thus under no obligation to do so.

11951.0000/2807813.1                    4

Complaint for Declaratory Relief

**EXHIBIT 2**
**Page 28**

Nationstar further contends that it has rescinded any alleged winning bids for the Loans under the Auction Terms and, even if such alleged winning bids were not rescinded, TCA's damages under the Auction Terms could not exceed the amount TCA paid to register under the Auction.com website.

23. TCA disputes Nationstar's contentions and claims instead that Nationstar is obligated to sell some or all of the Loans TCA contends it submitted winning bids on through Auction.com. TCA further contends that Nationstar is liable for breach of contract and promissory estoppel as a result of its rescission of the alleged winning bids for the Loans, and that Nationstar is liable to TCA for an amount in excess of the amount TCA paid to register under the Auction.com website.

24. A judicial declaration is necessary and appropriate at this time in order that Nationstar and TCA may ascertain their respective rights and duties with respect to the controversy alleged in paragraphs 20-23 above.

WHEREFORE, Nationstar prays for judgment as follows:

1. For a declaratory judgment that TCA is not entitled to purchase any of the Loans and not entitled to recover for breach of contract or promissory estoppel against Nationstar arising out of the circumstances alleged in the complaint.

2. In the alternative, for a declaratory judgment that TCA is not entitled to recover any amount from Nationstar arising out of its attempt to purchase the Loans in excess of the amount TCA paid Auction.com to register for the website.

3. For an award of costs of suit.

4. For an award of such other and further relief as the Court may deem just and proper.

11951.0000/2807813.1

5

Complaint for Declaratory Relief

EXHIBIT 2
Page 29



DATED:  July 25, 2013

SEVERSON & WERSON
A Professional Corporation

By: _____
Mark D. Lonergan

Attorneys for Plaintiff
NATIONSTAR MORTGAGE, LLC

11951.0000/2807813.1

6

Complaint for Declaratory Relief

EXHIBIT 2
Page 30

# EXHIBIT A

**EXHIBIT 2**
**Page 31**



**RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES**

**ONLINE ONLY BIDDING**

| SUMMARY OF KEY TERMS: | |
| --- | --- |
| INITIAL BIDDING DEPOSIT: | $5,000 Minimum per Pool – Please see Auction Registration Page for specifics |
| BUYER'S PREMIUM: | Greater of (i) 5% of the Winning Bid Amount or (ii) $10,000* |
| EARNEST MONEY DEPOSIT: | Greater of (i) 10% of the Total Purchase Price or (ii) $20,000 |

The Auction will be conducted by Auction.com ("Auctioneer"). Auctioneer, as used in these Terms and Conditions, shall include but not be limited to, any and all of its agents, employees, representatives, officers and directors. These Terms and Conditions generally describe the Auction of a pool of notes secured by real properties (individually, a "Note" and collectively, the "Notes") owned by one or more selling entities ("Seller" herein shall include the selling entity and its parent company, subsidiaries, or affiliated companies). The Sellers of the Notes listed have instructed Auctioneer to auction the listed Notes on the Terms and Conditions set forth below. Terms and Conditions may vary among the Notes in each Auction, so please review the Terms and Conditions for each Note carefully. Prospective purchasers who register in accordance with the instructions below will be deemed "Bidders" during the Auction. Winning Bidders (each a "Winning Bidder") will be required to execute loan sale documentation in a form and with terms and provisions required by Seller (the "Loan Sale Agreement"), which Loan Sale Agreement will incorporate many of these Terms and Conditions. The Loan Sale Agreement is posted at www.auction.com and is not negotiable.

## 1. REGISTRATION

Registration is required in order to bid online during the Auction and there is no fee to register. In order to register for the Auction, please go to www.auction.com, click on the "Online Bidding" tab and follow the registration instructions. As part of the registration process, you will be required, on a per Note basis, to (i) have a credit card authorization issued or make a refundable deposit by wire transfer or cashiers check to a third party escrow holder for the Initial Bidding Deposit, the amount of which shall be set forth for each particular Note on the auction registration page for such Note and (ii) for private investors (e.g. non-institutional), show proof of readily available funds in the form of bank statements and/or investment account (stocks/bonds) statements (dated within sixty (60) days). Any questions regarding qualification shall be directed to Seller's loan sale advisor as other qualification conditions may be required by Seller. Following registration approval, private investor Bidders may be required to provide, upon request, additional proof of readily available funds and/or an additional Initial Bidding Deposit amount to bid or continue bidding. In the event bidding has begun, then Auctioneer may suspend, in its sole discretion, any further bidding by Bidder until additional proof of funds and/or an additional Initial Bidding Deposit amount is confirmed by Auctioneer. Please ensure you register as a bidder in the name of the person or the entity that will be the buyer in the event your bid is the winning bid. Only the name of the registered bidder who has received final registration approval will be permitted on the loan sale documentation. If you are registering to bid as anything other than a natural person, you will be required to provide the necessary legal documentation evidencing good standing as an entity, which documentation may include the Articles of Incorporation or Organization, a Certificate of Good Standing issued within forty-five (45) days, ByLaws, Resolutions, Operating Agreement, Partnership Agreement, Trust document or other legal documentation evidencing the legal existence of the bidder as may be requested by the Auctioneer. Please follow the instructions on the website carefully to make sure you obtain final registration approval, which approval confirmation will be sent by e-mail to you and will allow you to bid online during the Auction. We highly recommend registering well in advance of the Auction to enhance your chances of being notified of any changes that may take place prior to Auction day. Individuals from outside the United States may register to bid online.

Page | 1

**EXHIBIT 2**
**Page 32**



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

### 2. DUE DILIGENCE

Each Note will have due diligence documents available for viewing in a secure data vault at www.auction.com. A confidentiality agreement will be required to be acknowledged and agreed to prior to entering the data vault. All Bidders must fully complete their Note due diligence prior to bidding, including reviewing the information contained in the data vault. No Bidder shall enter onto the premises or into the property secured by the Note or contact any borrower or any occupants or tenants of the underlying property without the authorization of the Seller, however viewing the property without entering onto the premises is permissible.

### 3. ONLINE BIDDING AND BUYING

Reserve Auction. This is a reserve auction and all Notes have a reserve price ("Reserve Price"), meaning the Seller of each Note can accept or reject any bid and has also established an unpublished, minimum selling price. The starting bid is not the Reserve Price. In order to become the Winning Bidder for a Note, a Bidder must meet or exceed the Reserve Price and the bid must be accepted by the Seller (see "Subject to Confirmation" section below). Except where prohibited by law, during a live bidding event (online or otherwise) the Auctioneer may open bidding on any Note by placing a bid on behalf of the Seller and may further bid on behalf of the Seller, up to the amount of the Reserve Price, by placing successive or consecutive bids for a Note, or by placing bids in response to other bidders. If no bidders meet the Reserve Price, the Seller is under no obligation to sell the Note. The Seller may withdraw a Note at any time prior to the announcement of the completion of the sale by the Auctioneer. Auctioneer is not acting as an agent for any Bidder in any capacity, and is acting exclusively as the Seller's agent as an auctioneer.

Buyer's Premium and Total Purchase Price. The purchase price will include a buyer's premium equal to the greater of five percent (5%) of the winning bid amount or $10,000 (*unless otherwise specified in the specific property listing or Loan Sale Agreement). Please check the Property details page at www.auction.com regarding Property specific terms. In the event the Seller is selling Notes that are in conjunction with a purchase option, then the buyer's premium may be paid separately from the purchase price by Buyer to Auctioneer, all as set forth in such Loan Sale Agreement. The total purchase price may also include escrow and reserve accounts (the "Total Purchase Price"), but does not include other amounts payable by the Buyer during closing, such as escrow/closing fees, etc. Please review the Loan Sale Agreement for specific details.

Bidding and Winning. The bidder authorization and log-in information given to you upon successfully registering to bid online shall be used by you during the Auction to bid on Notes. To purchase a particular Note at the Auction, one must be acknowledged by the Auctioneer as the Winning Bidder (the bidder to whom the Auctioneer acknowledges the Note as being "SOLD" to), and such Note is not identified as being sold "Subject to Confirmation" (see below). If you are the Winning Bidder, you will be contacted by phone by an Auctioneer representative at the phone number you provided during registration. Once contacted by an Auctioneer representative, the Winning Bidder will be sent, by e-mail, the Loan Sale Agreement and certain other documents for electronic signature, unless otherwise directed by Seller. The Loan Sale Agreement will contain the exact terms and conditions of the sale. As between Winning Bidder and Seller, the Loan Sale Agreement supersedes any and all other documents or information (including without limitation these Terms and Conditions) and serves as the governing document for the sale of each Note. After executing the Loan Sale Agreement electronically, which shall be executed within two (2) hours of Auctioneer's acknowledgment of the winning bid, Winning Bidder will be contacted by an escrow/closing agent or settlement attorney, who will provide them certain additional information pertaining to the closing process.

If a Winning Bidder cannot be reached within two (2) hours of Auctioneer's acknowledgment of the winning bid, or Winning Bidder fails to electronically execute the purchase documentation within two (2) hours of Auctioneer's acknowledgment of the winning bid, then Auctioneer or Seller can declare the Winning Bidder to be in default. In the event of such declaration, the Winning Bidder's bid shall be null and void and the Auctioneer and Seller shall have absolutely no further liability or obligation to that Bidder. IN ADDITION, SUCH WINNING BIDDER SHALL BE SUBJECT TO LIQUIDATED DAMAGES EQUAL TO TEN PERCENT (10%) OF THE PURCHASE PRICE AND AUCTIONEER AND SELLER

Page | 2

**EXHIBIT 2**
**Page 33**

RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

RESERVE THE RIGHT TO SEEK ANY AND ALL OTHER REMEDIES, INCLUDING SPECIFIC PERFORMANCE. Additionally, Seller shall have the right to retain the Initial Bidding Deposit as part of the liquidated damages. Furthermore, Auctioneer and Seller reserve the right to immediately put the Note back up for sale.

In order to allow final bids to be properly input and processed, the Auctioneer may extend the close of bidding for any Note in certain time increments to allow for additional bids. Once an extension of time has elapsed with no additional, higher bids, then the bidding will be closed.

Subject to Confirmation. In the event the winning bid amount is not immediately accepted by the Seller, the Auctioneer will inform the Winning Bidder that acceptance of their winning bid is "subject to confirmation." Winning Bidder acknowledges and agrees that Winning Bidder's purchase is subject to, and contingent upon, the Seller approving the purchase, which shall be given or denied at their sole and absolute discretion within five (5) business days following the close of the Auction and execution of the Loan Sale Agreement by the Winning Bidder. For certain assets, different timeframes may apply, please review the www.auction.com website and the purchase documentation for further information. The Winning Bidder shall be required to provide loan level pricing upon the execution of the Loan Sale Agreement. Seller shall at its sole discretion be able to approve or reject the contract individually with respect to each loan. Winning Bidder will receive a refund of monies deposited in the event Seller chooses not to accept the bid.

Payment of Deposit and Remaining Balance. As the Earnest Money Deposit, Winning Bidder shall be required to pay an amount equal to the greater of (i) ten percent (10%) of the Total Purchase Price or (ii) $20,000 on any Note purchase (unless otherwise specified in the loan sale documentation). The Earnest Money Deposit must be made no later than twenty-four (24) hours following the close of the auction (including Notes sold "subject to confirmation"). All monies will be immediately deposited with an escrow/closing agent or settlement attorney and shall be released to the Seller within twenty-four (24) hours following receipt by the escrow/closing agent of the deposit and the fully executed Loan Sale Agreement. The balance of the Total Purchase Price, along with all other costs and/or fees, must be paid as required in the Loan Sale Agreement.

If Winning Bidder fails to deliver the Earnest Money Deposit within twenty-four (24) hours following the close of the Auction, then Auctioneer or Seller can declare the Winning Bidder to be in default. IN SUCH EVENT, THE WINNING BIDDER SHALL BE SUBJECT TO LIQUIDATED DAMAGES EQUAL TO TEN PERCENT (10%) OF THE PURCHASE PRICE AND AUCTIONEER AND SELLER RESERVE THE RIGHT TO SEEK ANY AND ALL OTHER REMEDIES, INCLUDING SPECIFIC PERFORMANCE. Any further liability resulting from such default by Winning Bidder shall be controlled by the terms of the Loan Sale Agreement. Additionally, Seller shall have the right to retain the Initial Bidding Deposit as part of the liquidated damages.

Closing. All sales are expected to close with a national or regional escrow/closing firm within ten (10) business days of the close of the auction (fifteen (15) business days of the close of the auction for accepted "subject to confirmation" bids) or as set forth in the Loan Sale Agreement. Winning Bidders shall be required to pay all closing costs, including, but not limited to, escrow/closing fees, title fees and costs, recording fees, normal prorations, document preparation fees, and all documentary transfer taxes (or other taxes) as applicable and as set forth in the Loan Sale Agreement. Winning Bidders also may be required to pay additional fees and costs as provided in the Loan Sale Agreement.

Extensions. In certain cases, the Seller may grant an extension of the closing date, the terms and conditions of which are set forth in the Loan Sale Agreement. The Seller may require Buyer to pay a fee for such extension. This fee WILL NOT be credited towards the Total Purchase Price. All extension requests are evaluated by the Auctioneer and Seller on a case-by-case basis and may be granted or denied in their sole and absolute discretion.

Conveyance. Except as may be set forth in the Loan Sale Agreement, the Note will be assigned with a lender's title policy ensuring the Note's secured position, subject to standard title exclusions and exceptions and subject to the terms and conditions set forth in the Loan Sale Agreement. Bidder understands and agrees that neither Seller no Auctioneer makes any representations or warranties regarding the status of real estate taxes, liens, utility charges or other monetary

EXHIBIT 2
Page 34



**RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES**

**ONLINE ONLY BIDDING**

encumbrances affecting the property securing the Note. Bidder further understands and agrees and that it is the sole responsibility of Bidder to determine the status of real estate and personal property taxes, liens, utility charges or other monetary encumbrances that may be assessed against the property securing the Note, and neither Seller nor Auctioneer shall have any responsibility whatsoever with respect to payment of same.

### 4. PAYING FOR YOUR PURCHASE

No financing will be made available for the Auction. All purchases will be cash only. NO financing contingency shall be applicable to any Notes in the auction. Auctioneer does not provide lending or financial services.

### 5. FINDER'S FEE

A finder's fee, based on the winning bid amount, may be available on the Notes for which these Terms and Conditions are applicable and paid to individuals: (i) who have submitted a finder's fee registration form ("Finder's Fee Registration Form") (contact the loan sale advisor) at least twenty-four (24) hours prior to the start of the auction (the "Qualification Deadline"), (ii) whose client/Bidder successfully purchases a Note for which the finder's fee applies and the transaction closes, and (iii) who has satisfied all other requirements set forth herein. Please check the website for specific finder's fee amounts, if any, related to specific Notes. THERE WILL BE NO FINDER'S FEE REGISTRATION PERMITTED AFTER THE QUALIFICATION DEADLINE. THERE ARE NO EXCEPTIONS TO THE QUALIFICATION RULES. Please verify whether a finder's fee is applicable by checking the asset detail listing page.

To qualify for and earn a finder's fee, brokers/agents must:

1. Fully complete the Finder's Fee Registration Form, including the execution by your client/Bidder acknowledging your representation of such client/Bidder, and ensure that when your client/Bidder registers for the Auction, that they include your information as part of their registration;

2. Have a valid and active real estate broker or salesperson license and provide assistance to your client during the due diligence period;

3. Execute the loan sale documentation by electronic means, along with your client, within 24 hours of the client receiving the emailed documentation signing link. If you fail to sign the loan sale documentation within the time prescribed, you shall not be entitled to any finder's fee. Finder's fees will be earned and paid upon closing; and

4. Provide the Escrow/Closing Agent with an IRS Form W-9 or electronically complete an IRS Form W-9 in order to receive a finder's fee.

5. No finder's fee will be paid to a person or entity (a) acting as a principal in the purchase of any Note, (b) that is a director, employee, manager, or member of the client/bidder, or an affiliate of such client/bidder, or (c) is an immediate family member (defined as a spouse, parent, sibling, or child including in-law relationships) of such client/bidder.

### 6. GENERAL AUCTION INFORMATION

Sellers and Auctioneer reserve the right to deny any person the ability to bid and/or access to the online bidding platform for any reason. Seller and Auctioneer have the right to postpone or cancel the Auction, to withdraw any Note from the Auction and to change any terms of the Auction or particular conditions of sale upon announcement prior to or during the course of the Auction. In the event of a dispute among Bidders, the Auctioneer shall make the sole and final decision to either accept the final bid or to re-offer and resell the Note in dispute.

**EXHIBIT 2**
**Page 35**



RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

ONLINE ONLY BIDDING

The respective rights and obligations of the parties with respect to these Auction Terms and Conditions and the conduct of the Auction shall be governed by, interpreted and enforced under the laws of the state of California. By bidding in the Auction by the Internet, each Bidder shall be deemed to have irrevocably submitted to the courts of competent jurisdiction in Orange County, California (including the federal courts) in connection with any suit, proceeding or other legal process relating to the Auction and/or the offering or sale of any Note. Upon execution of the Loan Sale Agreement, all rights and remedies with respect to the Note covered by such Loan Sale Agreement shall be governed by such Loan Sale Agreement.

Offers made during the Auction are void where prohibited by law. Any information on any website, in any brochure, e-mail or postcard and any and all information available regarding the Notes shall not constitute an offer to sell or a solicitation of any offer to buy any of the Notes referenced herein. In addition, and without limitation of the foregoing, any website or brochure shall not constitute an offer to sell or a solicitation of any offer to buy nor shall there be any sales of any of the Notes in any state in which such offer, solicitation, or sale would be unlawful prior to the registration or qualification under the applicable securities laws of that state. No obligation to sell shall be binding on Seller unless and until a written contract of sale or loan sale agreement is signed and delivered by Seller. Seller reserves the right to rescind any oral acceptance of a winning bid prior to the execution and delivery of an executed contract of sale or loan sale agreement for any reason.

## 7. DISCLAIMER

Neither Seller nor Auctioneer makes any representations or warranties as to the accuracy or completeness of any information contained online at the Auction website or made available by the Seller or Auctioneer.   All prospective purchasers are required and encouraged to conduct their own due diligence and investigate all matters relating to the Notes that they are interested in purchasing in the Auction. Online bidding is provided on an "as is, as available" basis. No warranties, expressed or implied, including, but not limited to, those of merchantability or fitness for a particular purpose, are made with respect to the online bidding platform or any information or software therein.

Neither Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, those caused by any failure of performance, error, omission, interruption, defect, delay in operation of transmission, computer virus, or line failure. Neither Seller nor Auctioneer will be liable for any damages or injury, including, but not limited to, special or consequential damages that result from the use of, or the inability to use, the website, the materials on the website, or the online bidding platform even if there is negligence or Auctioneer or an authorized Auctioneer representative has been advised of the possibility of such damages, or both. The above limitation or exclusion may not apply to you to the extent that applicable law may not allow the limitation or exclusion of liability for incidental or consequential damages. Seller's, or Auctioneer's total liability to you for all losses, damages, and causes of action (in contract, tort (including without limitation, negligence), or otherwise) will not be greater than the amount you paid to access this site.

"AS IS, WHERE IS AND WITH ALL FAULTS".  ALL OF THE NOTES WILL BE SOLD BY SELLER AND AUCTIONEER "AS IS, WHERE IS AND WITH ALL FAULTS" AS MORE PARTICULARLY DESCRIBED IN THE LOAN SALE AGREEMENT.  ALL PROSPECTIVE PURCHASERS/BIDDERS ACKNOWLEDGE AND AGREE THAT SELLERS AND AUCTIONEER HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATE AND DISCLAIM ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, CONCERNING OR WITH RESPECT TO THE NOTES.  EACH PROSPECTIVE PURCHASER/BIDDER AND ANYONE CLAIMING BY, THROUGH OR UNDER THE SAME HEREBY FULLY AND IRREVOCABLY RELEASES SELLERS AND AUCTIONEER, THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, TRUST MANAGERS, REPRESENTATIVES, ATTORNEYS, BROKERS AND AGENTS ("REPRESENTATIVES") FROM ANY AND ALL CLAIMS THAT HE/SHE/IT OR THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLERS, AUCTIONEER AND THEIR REPRESENTATIVE FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATING TO ANY ERRORS, OMISSIONS OR OTHER CONDITIONS AFFECTING THE NOTES.  THIS RELEASE INCLUDES CLAIMS OF WHICH PROSPECTIVE PURCHASER/BIDDER IS PRESENTLY UNAWARE OR DOES NOT PRESENTLY SUSPECT TO EXIST IN HIS/HER/ITS FAVOR WHICH, IF KNOWN BY PROSPECTIVE PURCHASER/BIDDER, WOULD MATERIALLY AFFECT

Page | 5

EXHIBIT 2
Page 36



### RESERVE AUCTION TERMS AND CONDITIONS – POOL NOTES

#### ONLINE ONLY BIDDING

PROSPECTIVE PURCHASER'S/BIDDER'S RELEASE OF SELLERS AND AUCTIONEER. EACH PROSPECTIVE PURCHASER/BIDDER SPECIFICALLY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, AND OTHER APPLICABLE STATE STATUTES WHICH PROVIDE AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

By registering for the Auction, Bidder agrees to these Terms and Conditions, as may be updated from time to time prior to the Auction. Such form of acceptance by Bidder is binding and Bidder acknowledges it shall be binding and enforceable pursuant to the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("UETA") and applicable state laws.

01232013 POOL

Page | 6

EXHIBIT 2
Page 37

# EXHIBIT 3

FILED: NEW YORK COUNTY CLERK 03/07/2013
NYSCEF DOC. NO. 2

INDEX NO. 650794/2013

RECEIVED NYSCEF: 03/07/2013

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| KIRP, LLC;<br><br>   Plaintiff,<br><br>  v.<br><br>NATIONSTAR MORTGAGE LLC,<br><br>   Defendant. | Index No. _____<br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff KIRP, LLC ("KIRP"), by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint against Nationstar Mortgage LLC, hereby alleges as follows:

## INTRODUCTION

1. KIRP is a significant investor in certificates issued by six residential mortgage-backed security trusts sponsored by Residential Accredit Loans, Inc. (the "RALI Trusts"). KIRP brings this action against Nationstar, the Master Servicer for the RALI Trusts, for its liquidating loans owned by the trusts through on-line auctions at fire sale prices without authorization and in blatant abdication of its servicing duties under the governing contracts.

2. As the Master Servicer, the RALI Trusts pay Nationstar to "service" the mortgage loans owned by the trusts in the best interests of the trusts and their certificateholders. This includes working to maximize the recoveries on each of the mortgage loans through enumerated actions detailed in Pooling and Servicing Agreements (the "Servicing Agreements"), which set forth the Master Servicer's duties. However, rather than fulfilling its responsibilities to maximize recoveries, Nationstar has recently embarked on a campaign to benefit its own

00811.GL590/5201282.3

1

**EXHIBIT 3
Page 38**

interests at the expense of the RALI Trusts and their certificateholders, through auctioning off the trusts' mortgage loans in bulk ("Bulk Note Sales") for amounts that are a fraction of the loans' unpaid balances or the value of the properties securing the loans. While these Bulk Note Sales injure KIRP and the RALI Trusts' other certificateholders by dissipating the assets of the RALI Trusts, they provide multiple benefits to Nationstar, including through allowing them to more quickly recoup certain advances they made on the mortgage loans as part of their servicing duties. KIRP seeks to enjoin Nationstar from engaging in any further Bulk Note Sales in breach of its duties and to recover damages for the Bulk Note Sales that have already occurred.

3.      The six RALI Trusts at issue in this case were formed in 2005 and 2006. Pursuant to the Servicing Agreements for each of the RALI Trusts, a Master Servicer is responsible for servicing the mortgage loans included in trust portfolios for the benefit of certificateholders. The servicing duties include making collections on the mortgage loans and, when a mortgage loan goes into default, maximizing the recoveries through the use of specified options, such as modifying the loan, attempting to secure payment from the mortgagor, or ultimately foreclosing on the loan if no better option exists. As part of its duties, the Master Servicer is required to advance certain costs related to defaulted or delinquent loans, such as costs for maintaining or protecting the property securing the loans as well as certain principal and interest payments from non-paying borrowers. The Master Servicer is allowed to recoup these costs at later times.

4.      In July 2012, Nationstar purchased the servicing rights on the RALI Trusts from the prior Master Servicer, Aurora Loan Services. As part of that transaction, Nationstar assumed all of the duties of the Master Servicer under the Servicing Agreements, including the duty to service the mortgage loans owned by the RALI Trusts so as to maximize recoveries for the

EXHIBIT 3
Page 39

benefit of the trusts' certificateholders. Nationstar also purchased the right to collect all of the Servicer Advances that Aurora had been entitled to recoup, and also assumed liabilities for outstanding advances. Indeed, Nationstar acquired the right to ultimately recoup over $1 billion in advances as part of the acquisition.

5. However, Nationstar has not fulfilled its duties as Master Servicer, but rather has engaged in practices to enrich itself at the expense of the RALI Trusts' certificateholders. Specifically, as recently discovered by KIRP, beginning in mid-February 2013, Nationstar began selling the Trusts loans in internet auctions. Specifically, Nationstar executed Bulk Note Sales through auctioning off hundreds of defaulted mortgage loans, many owned by the RALI Trusts, at fire sale prices through an internet auction website, www.auction.com. These Bulk Notes Sales were impermissible for numerous reasons.

6. *First*, the Bulk Note Sales were not actions that Nationstar was authorized to take pursuant to the Servicing Agreements. Rather, the Servicing Agreements set forth enumerated steps that Nationstar is permitted to take to collect on defaulted loans, such as arranging for a payment plan, modifying a loan, permitting a short sale of the underlying property or, where necessary, foreclosing. The Servicing Agreements do not enumerate sales of mortgage notes, let alone Bulk Note Sales at deep discounts. To do so was in breach of contract.

7. Indeed, because Nationstar is not in any way authorized to sell loans, its actions amount to conversion. It was authorized to service the loans, or foreclose on the properties if all else failed. It was not entitled to sell the loans, let alone in bulk internet auctions.

8. *Second*, the Bulk Notes Sales breached Nationstar's express duties pursuant to the Servicing Agreements to act in the best interests of the certificateholders. Many of the mortgage loans that Nationstar auctioned off through the Bulk Note Sales only realized a fraction of the

00811.GL590/5201282.3

3

**EXHIBIT 3**
**Page 40**

unpaid principal balance of the loans and far less than the present value of the property securing the mortgage loans. The recoveries were thus well below the amounts that could have been recovered had Nationstar used the permitted means of effecting recoveries, such as loan modifications or individual foreclosures, and thus were not in the certificateholders' best interests.

9.      To the contrary, the only party that appears to have benefited from the Bulk Note Sales is Nationstar itself. By utilizing Bulk Note Sales to liquidate large numbers of mortgage loans, Nationstar accelerated its recoupment of the Servicer Advances that it had purchased from Aurora at a discount. Since Nationstar stands to collect the Servicer Advances ahead of recoveries going to the RALI Trusts, Nationstar will be able to recoup the Servicer Advances even if the recovery was for less than would have been recovered through permissible means. Moreover, by liquidating large number of defaulted loans, Nationstar was also able to improperly decrease the pool of defaulted mortgage loans it was responsible for servicing, thus decreasing the services it needed to provide to the RALI Trusts. And, by utilizing www.auction.com—a website with which Nationstar has a business affiliation—Nationstar was able to route business to a business partner which, in turn, benefited Nationstar.

10.     On February 5, 2013, KIRP wrote a letter to Nationstar expressing its extreme concern about the Bulk Note Sales of mortgage loans owned by the RALI Trusts and demanding that Nationstar cease from further Bulk Note Sales. Nationstar has not responded to the RALI Trusts' letter.

11.     Also on February 5, 2013, KIRP (as holder of more than 25% of a class of certificates in each of the RALI Trusts) directed the trustee for the RALI Trusts, Deutsche Bank Trust Companies Americas (the "Trustee"), to institute immediate legal action to prevent further

**EXHIBIT 3**
**Page 41**

Bulk Note Sales. On February 6, 2013, the Trustee's response recognized the "serious allegations" raised by KIRP's letter but indicated that it was unable to consider them quickly enough to pursue immediate legal action. It stated, however, that it had "no objection" to KIRP pursuing such action on its own "to protect all Certificateholders."

12.     KIRP therefore brings this complaint for breach of contract, conversion, and temporary, preliminary and permanent injunctive relief against Nationstar as Master Servicer for the RALI Trusts due to its breaches of its servicing obligations as set out in the Servicing Agreements governing the RALI Trusts.

<b><u>PARTIES</u></b>

13.     Plaintiff KIRP LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.

14.     Defendant Nationstar Mortgage LLC is incorporated in the State of Delaware and has its principal place of business at 350 Highland Drive, Lewisville, TX. It currently services over 645,000 mortgages totaling over $100 billion in unpaid principal balance. Nationstar Mortgage LLC is a licensed Mortgage Banker in New York State, NYS Banking Department, with an office at One State Street, New York, NY 10004.

<b><u>JURISDICTION AND VENUE</u></b>

15.     This Court has jurisdiction over the subject matter of this action pursuant CPLR §302(a)(2). Venue lies in this Court pursuant to CPLR § 501 and § 503.

16.     This Court has personal jurisdiction over Defendant Nationstar Mortgage LLC. because it entered into a contract to provide services in the state, engages in persistent course of conduct in the state, and expects, or should reasonably expect its acts to have consequences in the state and derives substantial revenue from interstate commerce. Moreover, Defendant Nationstar submitted to the jurisdiction of any New York State court sitting in New York County

00811.GL590/5201282.3                                      5

<b>EXHIBIT 3<br>Page 42</b>

in its contract with the predecessor servicer in which it assumed the role of Master Servicer for the RALI Trusts.

## FACTS AND GENERAL ALLEGATIONS

### BACKGROUND

17. This case concerns six securitization trusts, each of which are backed by pools of residential mortgage loans. The six securitizations are: RALI 2005-QO2; RALI 2005-QO4; RALI 2005-QO5; RALI 2006-QO5; RALI 2006-QO1; and RALI 2006-QO7. A set of Standard Terms of Pooling and Servicing Agreement, dated as of August 1, 2004 ("Standard Terms"), along with a Series Supplement, governs each of the RALI Trusts (each of the Series Supplements, along with the Standard Terms, collectively, a "Servicing Agreement").

18. Mortgage pass-through securities, or Certificates, represent interests in the cash flows of the loans underlying the RALI Trusts. These Certificates are commonly and generically referred to as "RMBS," or residential-mortgage backed securities. Investors in the Certificates, like Plaintiffs, are entitled to monthly distributions of the cash flows from the mortgage loans—primarily borrower payments of principal and interest—which are "passed through" the Trust to the Certificateholders.

19. Residential Accredit Loans, Inc. ("RALI") is the seller of the Certificates of the RALI Trusts. Deutsche Bank Trust Company Americas is the Trustee. Defendant is the Master Servicer.

### DUTIES OF THE MASTER SERVICER

20. Article III of the Servicing Agreements broadly sets forth Defendant's contractual obligations as Master Servicer. The Master Servicer's duties include, but are not limited to, maintaining loan files and mortgage loan documents; accepting and recording mortgage payments from borrowers, paying taxes and insurance from borrower escrow accounts,

00811.GL590/5201282.3                                    6

**EXHIBIT 3**
**Page 43**

negotiating workouts and modifications of mortgages upon default, and conducting or supervising the foreclosure process when needed. The standards the Master Servicer are required to follow in conducting these activities are set out in the Servicing Agreement.

21.     For example, section 3.07 of the Servicing Agreements sets forth the Master Servicer's duties in connection with its collection activities. It provides:

> The Master Servicer shall make *reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans,* and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Insurance Policy, *follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities.*

(emphasis added).

22.     Furthermore, to avoid unnecessary foreclosures when borrowers fall behind on their payments, the Servicing Agreements authorize the Master Servicer to engage in efforts commonly referred to as "loss mitigation." Subject to specific limitations in the Servicing Agreements, the Master Servicer is authorized, under certain conditions, to waive certain late payments and prepayment charges; extend due dates for payment on a mortgage loan, waive, modify or vary any term of any mortgage loans; and/or "consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders." *See* Section 3.07 of the Servicing Agreements.

23.     The Servicing Agreements also require the Master Servicer to extend advances from time to time. Advances are loans that the Master Servicer extends to the RALI Trusts to cover, among other things, payments missed by borrowers and other customary, reasonable and

**EXHIBIT 3**
**Page 44**

necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or unanticipated event (collectively "Advances"). Generally speaking, the Master Servicer must make such advances unless the Master Servicer deems a proposed advance to be non-recoverable. The Master Servicer is entitled to eventually recover these advances from the eventual proceeds of an REO liquidation and/or short sale. See Standard Terms 3.10.

24. The Servicing Agreements also govern the steps the Master Servicer may take in regard to defaulting loans. Section 3.14 provides:

> (a) The Master Servicer shall foreclose upon or otherwise comparably convert (which may include an REO Acquisition) the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. Alternatively, the Master Servicer may take other actions in respect of a defaulted Mortgage Loan, which may include (i) accepting a short sale (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permitting a short refinancing (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the Mortgaged Property), (ii) arranging for a repayment plan or (iii) agreeing to a modification in accordance with Section 3.07. In connection with such foreclosure or other conversion, the Master Servicer shall, consistent with Section 3.11, follow such practices and procedures as it shall deem necessary or advisable, as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide.

25. There is no provision in the Servicing Agreements for the sale of loans, let alone sales of loans in bulk.

26. The Master Servicer's failure to comply with any of these obligations constitutes an event of default. Specifically, under section 7.01(ii) of the Servicing Agreements, an Event of Default arises when:

> (ii) the Master Servicer shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in the Certificates of any Class or in this Agreement and such failure shall continue unremedied for a period of 30

00811.GL590/5201282.3                    8

**EXHIBIT 3**
**Page 45**

days (except that such number of days shall be 15 in the case of a failure to pay the premium for any Required Insurance Policy) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or the Company, or to the Master Servicer, the Company and the Trustee by the Holders of Certificates of any Class evidencing, in the case of any such Class, Percentage Interests aggregating not less than 25%.

## NATIONSTAR BUYS THE SERVICING RIGHTS AND RESPONSIBILITIES OF THE PLAINTIFF TRUSTS

27.     At the RALI Trusts' inception, the Master Servicer was Residential Funding Corporation.  In 2008, Aurora Loan Services LLC ("Aurora") assumed the servicing responsibilities.  Over the next several years, many of the loans in the Trusts and affiliated RALI trusts became non-performing.  Their non-performance caused Aurora to advance very substantial sums in its duties as Master Servicer, reaching well north of $1 billion over all trusts serviced by Aurora.

28.     Last year, Aurora sold all of its servicing rights to Defendant Nationstar.  Specifically, on March 6, 2012, Aurora and Nationstar entered into an asset purchase agreement ("Asset Purchase Agreement"), in which Aurora agreed to sell its servicing assets in the Plaintiff Trusts.  The purchase closed on June 28, 2012.

29.     Through that agreement, Nationstar acquired approximately $63.7 billion in residential mortgage servicing rights, as measured by unpaid principal balance.  The cash purchase price of the mortgage servicing rights was approximately $268 million, related largely to servicing advance receivables.  Many of the loans that Nationstar purchased the servicing rights to were non-performing.  In order to complete the servicing acquisition, Nationstar also financed $1.45 billion to fund the balance of the related servicing advance receivables.  In other words, as a result of the acquisition of Aurora's servicing rights, Nationstar had to borrow $1.45 billion just to fund the outstanding advances Aurora had made.

EXHIBIT 3
Page 46

30.     As part of the Asset Purchase Agreement, Nationstar agreed to assume Aurora's rights and responsibilities related to the Servicing Agreements for the Plaintiff Trusts. *See* Asset Purchase Agreement, § 2.02.  The Asset Purchase Agreement also contained the following provision regarding the standard of care that Nationstar was contractually obligated to use in servicing the acquired loans, including those in the Plaintiff Trusts:

> [W]ith respect to the servicing of the Serviced Mortgage Loans . . . and the collection of Servicer Advances, Purchaser shall (i) exercise the degree of care which is standard in the industry with respect to the servicing of similar loans (including the conduct of Foreclosures and the management of property) and the collection of similar advances and claims and (ii) service such Serviced Mortgage Loans in accordance with applicable Law and in accordance with applicable Investor and Insurer requirements governing servicers and the provisions of the applicable Servicing Agreements and Subservicing Agreements.

Asset Purchase Agreement, § 7.10(w).

## NATIONSTAR USES INTERNET SITE TO AUCTION OFF POOLS OF NON-PERFORMING LOANS WITHOUT AUTHORIZATION OR NOTICE TO THE RALI TRUSTS

31.     Nationstar thus assumed all of Aurora's multi-billion dollar portfolio of loan servicing rights and responsibilities, and agreed pursuant to the Trusts' contracts to service those loans for the benefit of certificateholders.  But that is not what it did.

32.     In mid-February 2013, just months after purchasing Aurora's servicing rights, Plaintiff discovered that rather than servicing the loans, Nationstar was using an internet website to auction non-performing loans in the RALI Trusts and others.  In particular, Nationstar held two day auctions of dozens of pools of loans on an internet website: www.auction.com. Nationstar's auction was called "$250 Million+ in Residential Non-Performing Note Auction – Secured by Residential Assets in CA, CO, FL,GA, IL, MD, MA, NJ, NM, NY, OR, PA, TN, UT, VA & WA. All offered in Pools.(N-098)."  The first auction began on February 19, 2013 and ended two days later.  The second auction began on March 4, 2013 and ended two days later on

**EXHIBIT 3**
**Page 47**

March 6, 2013. Another is scheduled to commence March 11, 2013. Although the auction bidding has closed for the first two, the sale and transfer is not complete for any of the auctions.

33. As the description indicated, Nationstar was selling pools of loans, including those owned by the RALI Trusts. For example Nationstar auctioned eight mortgage notes for properties in Staten Island, New York for $1,745,000, despite the fact that broker opinion price on the underlying properties was $3,490,000. In other words, Nationstar fire sold these mortgage notes for only 50% of the broker value of the underlying properties. There are numerous other egregious examples: ten mortgage notes for properties in Essex, New Jersey auctioned for $470,000 when the broker opinion price on the underlying properties was $1,450,000 (auctioned for 32% of the broker price opinion); twenty mortgage notes for properties in Seattle, Washington auctioned for $3,425,000 when the broker opinion price on the underlying properties was $5,250,900 (auctioned for 65% of the broker price opinion); and five mortgage notes for properties in Chicago, Illinois auctioned for $440,000 when the broker opinion price on the underlying properties was $763,300 (auctioned for 58% of the broker price opinion).

34. On information and belief, the prices realized from bulk sales on an internet website posting dozens of pooled properties open for two days are significantly lower than the recoveries that could have been realized from continued servicing, modification or foreclosure.

35. No notice of this auction was given to the RALI Trusts' Trustee or their certificateholders. Nor is there any provision in the contract that would allow a Master Servicer to sell any of the loans, not to mention selling them in bulk in an internet fire sale. The Master Servicer is supposed to service the loans, modify the loans, or foreclose on the property and distribute the proceeds. It is not entitled to sell the loans.

**EXHIBIT 3**
**Page 48**

36.    Upon information and belief, Nationstar has attempted to use the proceeds of this internet sale to accelerate its recoupment of the advances that Aurora had made and Nationstar had financed as part of the Asset Purchase.

## NATIONSTAR AND AUCTION.COM CROSS PROMOTE

37.    Notably, auction.com advertises for Nationstar on its website. Under "Financing Information" it includes a description and endorsement of Nationstar Mortgage and describes how "Nationstar Mortgage offers multiple solutions and strives to provide ultimate customer satisfaction . . . ." http://www.auction.com/nationstar.php

38.    And, vice versa, Nationstar's website advertises for auction.com. On Nationstar's pages regarding REO Finance, it exclaims how "Nationstar Mortgage and Auction.com Have Teamed Up to Provide REO Expertise."

## TRUSTEE'S REFUSAL TO TAKE ACTION

39.    Shortly after learning of Nationstar's practices, Plaintiff contacted the Trustee for the Plaintiff Trusts, Deutsche Bank Trust Company Americas ("the Trustee") to inform it of Nationstar's conduct and request enforcement against Nationstar. On March 5, 2013, Plaintiff, as holders of at least 25% of the certificate in a class in each of the RALI Trusts, made a written request upon the Trustee to institute such an action in its own name as Trustee and offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein. In particular, Plaintiff notified the Trustee of Nationstar's default and breaches of its duties under the Servicing Agreements by executing bulk sales of non-performing mortgage notes through www.auction.com.

40.    On March 6, 2013, the Trustee responded to the letter, indicating that it would not be able to pursue emergency action without additional time, but endorsing KIRP's right to do so. The letter stated "Given this limited time and information provided to the Trustee to consider

00811.GL590/5201282.3                12

**EXHIBIT 3**
**Page 49**

these complex issues, the Trustee cannot meaningfully consider and respond to them in the allotted time." The Trustee concluded: "We are mindful of your representations that time is of the essence, and the Trustee seeks to avoid the possibility of harm to Certificateholders. Accordingly, the Trustee understands that your client intends to proceed with legal action in its own name to protect all Certificateholders, and the Trustee has no objection to your client pursuing that course of action."

## FIRST CLAIM FOR RELIEF
## (BREACH OF THE SERVICING AGREEMENTS)

41.    Plaintiff repeats all of the foregoing allegations as though fully set forth herein.

42.    This is a claim against Defendant for breach of contract with respect to each of the Servicing Agreements. The Servicing Agreements are valid contracts between, among others, Defendant, the Master Servicer, and the RALI Trusts, and Plaintiff is a third party beneficiary to the Servicing Agreements.

43.    In the Servicing Agreements, and for valuable consideration, Defendant agreed to serve as the Master Servicer for the RALI Trusts and undertook duties as the Master Servicer subject to the terms and conditions set forth in the Servicing Agreements. Specifically, in the event of a defaulting mortgage loan, Section 3.14 enumerates what actions the Master Servicer is entitled to take:

> (a) The Master Servicer shall foreclose upon or otherwise comparably convert (which may include an REO Acquisition) the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. Alternatively, the Master Servicer may take other actions in respect of a defaulted Mortgage Loan, which may include (i) accepting a short sale (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permitting a short refinancing (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the

00811.GL590/5201282.3                                13

EXHIBIT 3
Page 50

Mortgaged Property), (ii) arranging for a repayment plan or (iii) agreeing to a modification in accordance with Section 3.07. In connection with such foreclosure or other conversion, the Master Servicer shall, consistent with Section 3.11, follow such practices and procedures as it shall deem necessary or advisable, as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide; provided that the Master Servicer shall not be liable in any respect hereunder if the Master Servicer is acting in connection with any such foreclosure or other conversion in a manner that is consistent with the provisions of this Agreement.

44.    Defendant has breached those obligations in numerous ways, including but not limited to:

- bulk-selling and pursuing bulk sales of mortgage notes without authorization and in breach of the Servicing Agreements;

- employing sales practices—including the use of an internet auction site that does not customarily handle the sale of non-performing loan pools— that are not designed to maximize returns on the mortgage loans for the RALI Trusts' investors;

- breaching Servicing Agreement section 3.07 through its improper sales practices and failing to exercise "good faith business judgment" and "make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans;"

- breaching section 3.14 of the Servicing Agreements by pursuing actions not allowed by the Servicing Agreements and addressing defaulted mortgage loans in ways that are not "necessary or advisable" or "normal or usual."

45.    The RALI Trusts have performed all of the conditions, covenants, and promises required in accordance with the Servicing Agreements in order to enforce the Defendant's obligations under the Servicing Agreements.

46.    Defendant should be required to abide by its contractual obligations under the Servicing Agreements.  As a result of Defendant's past and continuing improper bulk sales of mortgage assets, the RALI Trusts and their Certificateholders have been irreparably harmed. The RALI Trusts and their Certificateholders should be awarded an injunction against sale and

00811.GL590/5201282.3

14

EXHIBIT 3
Page 51

transfer of the auctioned loans and against further sales of loans as well as damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
## (CONVERSION)

47.    Plaintiff repeats all of the foregoing allegations as though fully set forth herein.

48.    As Master Servicer, Defendant took possession of the mortgage loans collateralizing the RALI Trusts.  Under the Servicing Agreements, Defendant was given the authority to service those loans including if necessary modification or foreclosure.  Authorized actions in the even of borrower default were specifically enumerated in section 3.14.

49.    Nowhere in any contract was Defendant given the authority to sell the loans.

50.    Without permission or authority, Defendant sold loans in the RALI Trusts through improper bulk sales auctions of the mortgage loans and interfered with the RALI Trusts' enjoyment and right of possession over that property.

51.    Compounding the harm caused by Defendant's *ultra vires* disposal of the mortgage loans, Defendant is improperly exercising dominion and control over the proceeds of the unauthorized bulk sales.  Without authority and in breach of the Servicing Agreements, upon information and belief, Defendant has converted portions of the proceeds of the bulk sales to improperly reimburse itself for servicing advances, recoup other expenses and fees related to the unauthorized bulk sales, and other servicing fees and costs.

52.    Defendant's improper disposal of the mortgage loans and improper diversion of the proceeds of the sales has deprived and continues to deprive the RALI Trusts of its lawful rights to the mortgage loans.

53.    Defendant's improper conduct has been and continues to be without the consent of the RALI Trusts.

00811.GL590/5201282.3                              15

EXHIBIT 3
Page 52

54.    Plaintiff is entitled to an injunction preventing further conversion and damages in an amount to be determined at trial as a direct and proximate cause of Defendant's conversion of the RALI Trusts' property.

## THIRD CLAIM FOR RELIEF
## (UNJUST ENRICHMENT)

55.    Plaintiff repeats all of the foregoing allegations as though fully set forth herein.

56.    Defendant, through its breaches of the Servicing Agreements, and unauthorized bulk sale of the mortgage notes, has enriched itself at the expense of the RALI Trusts and their Certificateholders.    Defendant has been unjustly enriched in numerous ways, including but not limited to its unjust recoupment of servicing advances.

57.    It is therefore against equity and good conscience to permit Defendant to retain such recoveries and other unjust benefits received for its breaches of the Servicing Agreements. Defendant must disgorge all such recoveries received on breaching the Servicing Agreements.

## FOURTH CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

58.    Plaintiff repeats all the foregoing allegations as though fully set forth herein.

59.    Defendant has breached the Servicing Agreements in numerous ways.

60.    Despite repeated requests, Defendant has refused to cease and desist from its conduct and provide assurances of the same.  The RALI Trusts reasonably expect that Defendant will continue its improper bulk sale practices absent an order from the Court.

61.    Consequently, there exists a real and justiciable controversy as to the rights and legal relations of the parties under the Servicing Agreements.

62.    Pursuant to New York C.P.L.R. § 3001, Plaintiff requests a declaration that Defendant's practice of bulk loan sales on the auction.com website violates section 3.07, 3.14

00811.GL590/5201282.3                              16

EXHIBIT 3
Page 53

and other terms and conditions of the Servicing Agreements, and an order giving effect to such declaration.

## FIFTH CLAIM FOR RELIEF
### (TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION)

63.    Plaintiff seeks a temporary restraining order and preliminary injunction enjoining Defendant from violating the Servicing Agreements. In particular, Plaintiff seeks a temporary restraining order and preliminary injunction against final sale and transfer of the auctioned loans as well as against any further auctions or other sales of the loans in the Trusts.

64.    Plaintiff has a clear right to this relief based on the allegations set forth above.

65.    If the Court were to deny Plaintiff's request for injunction, there is a substantial threat that Plaintiff will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

a.    A declaration that Defendant's bulk sales of mortgage loans on the auction.com website violate the Servicing Agreements in the respects articulated above;

b.    An award to Plaintiff of a temporary restraining order and preliminary injunctive relief enjoining Defendant from final sale and transfer of the already auctioned loans, as well as enjoining any further selling loans, in bulk on the auction.com website or otherwise, and against further violations of the Master Servicer's duties under the Servicing Agreements;

c.    Disgorgement of all unjust profits and recoveries Defendant received as a result of its breaches of the Servicing Agreements;

d.    An award of all compensatory, consequential, and/or equitable damages from Defendant, further compensating for the Trusts' losses relating to all mortgage loans sold

00811.GL590/5201282.3                    17

EXHIBIT 3
Page 54

through the Master Servicer's improper bulk sales practices and other breaches of its obligations
under the Servicing Agreements;

      e.     Reimbursement of costs and expenses of maintaining this action for the
benefit of the RALI Trusts, including reasonable attorney's and expert fees;

      f.     Prejudgment interest, as approved by the Court; and

      g.     An award of such other and further relief as this Court may deem just and
proper.

Dated:     New York, New York
           March 7, 2013

                                  QUINN EMANUEL URQUHART &
                                  SULLIVAN, LLP

                                  By: _____
                                  Jonathan E. Pickhardt
                                  Erica P. Taggart
                                  Elinor Sutton

                                  51 Madison Avenue, 22nd Floor
                                  New York, NY 10010
                                  Telephone: (212) 849-7000
                                  Facsimile: (212) 849-7100
                                  jonpickhardt@quinnemanuel.com
                                  ericataggart@quinnemanuel.com
                                  elinorsutton@quinnemanuel.com

                                  *Attorneys for Plaintiff*

**EXHIBIT 3
Page 55**

# EXHIBIT 4

# BUTZEL LONG
## ATTORNEYS AND COUNSELORS

*a professional corporation*

Robert D. Piliero
212 676 3059
piliero@butzel.com

22nd Floor   380 Madison Avenue
New York, New York  10017
T: 212 818 1110  F: 212 818 0494
butzel.com

*Also admitted in New Jersey*

### FOR SETTLEMENT PURPOSES ONLY

July 23, 2013

**BY E-MAIL (jbs@severson.com)**
**AND REGULAR MAIL**

John B. Sullivan, Esq.
Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, Ca 94111

Re:    Truman Capital Advisors LP v. Nationstar Mortgage, LLC

Dear John:

We represent Truman Capital Advisors LP ("TCA") in connection with claims against Nationstar Mortgage, LLC ("Nationstar").  As you know from our previous communications, those claims arise out of the auction completed earlier this year in which TCA was the winning bidder with respect to 534 non-performing mortgage notes, which Nationstar agreed to sell and TCA agreed to purchase for approximately $150 million. You have previously advised that Nationstar refuses to complete the sale of those Notes simply because it "has made the decision not to go forward with those sales." Our investigation reveals that Nationstar now recognizes that the prices at which it agreed to sell the Notes to TCA were significantly below market.  As seller's remorse has never been recognized as a legitimate basis for reneging on a contract, TCA has asked Nationstar either to complete the sale of all the Notes or to compensate TCA for being deprived of the benefit of its bargain.

Previous attempts to initiate a responsible dialogue with Nationstar, both through principal-to-principal dialogue and through my own contacts with you and Nationstar's New York counsel, John Lavelle, have been unsuccessful. The only substantive response I have received was the e-mail and attachment you sent through Mike Callahan of Auction.com, in which you indicated that Nationstar might "consider" reimbursing TCA for some of its due-

Ann Arbor    Bloomfield Hills    Detroit    Lansing    New York    Washington D.C.

*Alliance Offices*    Beijing    Shanghai    Mexico City    Monterrey    *Member Lex Mundi*    www.butzel.com

**EXHIBIT 4**
**Page 56**

John B. Sullivan, Esq.
July 23, 2013
Page 2


diligence expenses, but only if TCA agreed, *a priori*, to seek no other compensation.[1]  That dismissive proposal was rejected out of hand because it assumes, incorrectly we believe, that Nationstar has no liability exposure to TCA.

Against this background, it appears that litigation may unfortunately be unavoidable.  As a final attempt to open a good-faith dialogue to explore whether that course of action can be avoided, I enclose a copy of the current draft of the Complaint we intend to file. Please let me know whether you are authorized by Nationstar to accept service of process of the final version which we intend to file by the end of this week in the absence of a meaningful response to this settlement overture.

Very truly yours,

*Robert D. Piliero /s/*

Robert D. Piliero

RDP/sl
Encl.

cc:  Michael Callahan, Esq. (w/ encl.) (By e-mail) (mcallahan@auction.com)

---

[1] Nationstar has never asserted, nor could it, that any legal impediment prevented it from honoring its commitment to sell the 80% of the Notes Nationstar had agreed to sell to TCA which were unaffected by the Temporary Restraining Order ("TRO") issued by Justice Bransten in *KIRP, LLC v. Nationstar Mortgage, LLC*, Index No. 650794/13 (the "KIRP Action").  Nor has KIRP ever claimed any interest in those Notes or any right to stop their sale. As to the remaining 20% of the Notes that Nationstar agreed to sell to TCA in which KIRP does claim an interest, the TRO was dissolved months ago, and Nationstar vigorously asserts that completing those sales would not constitute a breach of KIRP's contractual rights. Indeed, Nationstar has recently judicially admitted that that the "unambiguous terms" of the applicable mortgage servicing agreements with KIRP "expressly permitted" it to sell non-performing Notes, including those it agreed to sell to TCA and others. *See* Nationstar's Memorandum in Support of Motion to Dismiss the Complaint in the KIRP Action, at 17 – 21.

BUTZEL LONG

**EXHIBIT 4**
**Page 57**

# FOR SETTLEMENT PURPOSES ONLY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TRUMAN CAPITAL ADVISORS LP,

        Plaintiff,

-vs-

NATIONSTAR MORTGAGE, LLC,

        Defendant.

Index No.

**COMPLAINT**

Plaintiff Truman Capital Advisors, LP ("TCA"), through its undersigned counsel, respectfully asserts as its Complaint against Nationstar Mortgage, LLC ("Nationstar") as follows:

## NATURE OF THE ACTION

1.     This dispute arises out of Nationstar's repudiation of its agreement to sell to TCA certain residential mortgage loans ("Notes") for an agreed price of approximately $150 million. Nationstar offered hundreds of such Notes for sale through an on-line auction hosted by its agent, Auction.com. TCA and a number of other investors devoted substantial time and substantial money reviewing the information Nationstar provided regarding the Notes it was offering for sale; conducting extensive due diligence regarding the quality and potential value of these hundreds of loans; and participating in the bidding process. By the end of that process, acting through its agent, Auction.com, Nationstar had notified and confirmed to TCA that it was the winning bidder with respect to 534 Notes.

2.     Within a few days, however, Nationstar, again acting through its agent, Auction.com, notified TCA that Nationstar refused to complete the sale and transfer of the Notes

-1-

**EXHIBIT 4**
**Page 58**

covered by TCA's winning bids.  Nationstar offered no explanation for this reversal other than to say that it "has made the decision not to go forward with those sales."  However, upon information and belief, Nationstar's decision in that regard was based principally, if not solely, on its belated realization that the reserve prices it had set for, and at which it had agreed to sell, the Notes to TCA was significantly lower than their fair market value. Nationstar's decision to renege on its commitment to sell the Notes to TCA at the agreed price has TCA to suffer at least $35 million in damages.

## PARTIES

1.      Plaintiff TCA is a limited partnership with its principal offices located at 200 Business Park Drive, Suite 103, Armonk, New York 10504.

2.      Defendant Nationstar is a limited liability company that is a registered Mortgage Banker licensed by the New York Banking Department, with offices located at One State Street, New York, New York 10004.

3.      This Court has personal jurisdiction over Nationstar pursuant to CPLR 301 and 302 because it does business and transacts business New York. Venue is properly laid in this Court pursuant to CPLR 503.

## BACKGROUND

4.      Nationstar is a "mortgage servicer" with a nationwide scope of business.  In the context of residential mortgage loans, a mortgage servicer is a company that has full power and authority, acting alone or through sub-servicers, to take any and all action deemed necessary or appropriate in connection with the administration of mortgage loans that are covered by a Master

-2-

**EXHIBIT 4**
**Page 59**

Servicing Agreement. Upon information and belief, Nationstar currently services nearly 650,000 mortgages with an aggregate unpaid principal balance of more than $100 billion.

5.    In July 2012, Nationstar purchased the servicing rights as Master Servicer on a large volume of residential loans from Aurora Loan Services ("Aurora"). As part of that transaction, Nationstar assumed all of the rights and obligations of the Master Servicer under Pooling and Servicing Agreements (the "PSAs), including the right to take all actions necessary or appropriate to maximize recoveries on each of the mortgage loans. Nationstar has publicly acknowledged that among the rights and obligations conferred on it by the governing agreements is the right to sell non-performing loans.

## Nationstar Decides to Sell Non-Performing Loans at Auction

6.    In or about January 2013, Nationstar engaged Auction.com as its exclusive agent to sell, by auction, to conduct a series of Reserve auctions for the sale of a large number of non-performing residential mortgage loans that were to be grouped into "pools" of such loans, with a number of pools to be offered for sale at each of the Reserve auctions contemplated by Nationstar.

7.    An auction is a process used to buy and sell goods and services by offering them for bid, receiving bids, and then selling the item to the highest bidder. The English auction, also known as an open ascending price auction, is believed to be the most common form of auction in use today. Participants openly bid against each other, with each subsequent bid required to be higher than the previous bid. The auction ends when no participant is willing to bid further, at which point the auctioneer announces a sale to the highest bidder, thus creating a binding obligation by the seller to sell and a binding obligation by the successful bidder to buy.

-3-

EXHIBIT 4
Page 60

8. · A variation on the English auction is the Reserve auction. In a Reserve auction, the seller may establish a minimum sale, or "reserve," price in advance. If the final bid does not meet or exceed the reserve price, then the item remains unsold.

9. In all auctions, Reserve or otherwise, the sale is complete when the auctioneer announces the winning bidder. After that announcement, the seller may not withdraw the item and is legally bound to complete the sale to the winning bidder.

10. Auction.com is a highly respected and significant provider of online real estate auction services. Upon information and belief, Auction.com has acted as a seller's agent in connection with the sale of approximately $20 billion worth of property since 2007.

11. On or about January 23, 2013, Auction.com published Reserve Auction Terms and Conditions ("Auction Terms") that would govern all the online auctions that it would conduct for Nationstar. A true copy of the Auction Terms is annexed hereto as Exhibit 1, and its provisions are incorporated herein.

12. The Auction Terms provided that due diligence records would be made available for each Note in a secure data vault, and that all bidders would be required to fully complete their due diligence on each Note before bidding, including a review of the records in the data vault.

13. On or about January 23, 2013, as required by the Auction Terms, TCA submitted an on-line registration which enabled it to participate as a bidder in the auctions of Notes to be offered for sale by Nationstar.

14. On or about January 31, 2013, TCA began its detailed financial review of each Note as part of its due diligence. That review included, but went far beyond, the records that Nationstar had electronically deposited in the data vault.

-4-

FOR SETTLEMENT PURPOSES ONLY

EXHIBIT 4
Page 61

**KIRP Objects to the Sale of Some of the Notes**

15. On February 5, 2013, non-party KIRP LLC ("KIRP") wrote a letter to Nationstar expressing concern about Nationstar's stated intention to auction any Notes (the "Challenged Notes") that were collateral for the certificates issued by six residential mortgage-backed security trusts sponsored by Residential Accredit Loans, Inc. (the "RALI Trusts") in which KIRP had a financial interest. In the letter, KIRP asserted that Nationstar lacked authority to sell the Challenged Notes under the terms of the applicable Servicing Agreements.

16. The Notes covered by the PSAs with Nationstar involved hundreds of Notes that had not been sponsored by the RALI Trusts, and in which KIRP had no financial interest.

17. Upon information and belief, Nationstar did not respond to KIRP's letter, nor did it remove the Challenged Notes from the pool of Notes it was offering for sale.

18. Nationstar did not inform TCA or, upon information and belief any of the entities that had registered to participate in the auction, about KIRP's letter, its objections or its assertion that Nationstar lacked the legal right to sell the Challenged Notes.

19. Unaware of KIRP's objection to the sale of the Challenged Notes, TCA continued its detailed due diligence review of 636 Notes on which it had an interest.

**TCA is the Winning Bidder on 304 Notes**

20. Nationstar did not remove the Challenged Notes from the First Auction while it was in progress.

21. At no time during the two-days in which this first auction was in progress did Nationstar inform TCA, or, upon information and belief any of the other registered bidders, about KIRP's claim regarding the Challenged Notes.

22. On or about February 21, 2013, after completing its extensive due diligence review, TCA timely placed bids, in multiple pools, on 480 of the Notes offered for sale.

- 5 -

**EXHIBIT 4**
**Page 62**

Although unknown to TCA, some of the 480 Notes on which it had submitted bids were Challenged Notes

23.     At the conclusion of the auction, Auction.com confirmed in writing that TCA was the winning bidder with respect to multiple pools totaling 304 Notes.  The winning bid price was approximately $94,045,115.

24.     The auctioneer's announcement that TCA had won these Notes created a binding obligation for Nationstar to sell the 304 Notes to at the agreed price. Although unknown to TCA, some of these Notes were Challenged Notes.

**Nationstar's Auction Sale Continues**

25.     On or about February 19, 2013, Auction.com announced that Nationstar's sale of non-performing Notes would continue in another two-day Reserve auction, covering additional pools of Notes to be sold by Nationstar, under the same Auction Terms as the first auction of Notes on behalf of Nationstar, and pursuant to the same on-line registration that TCA had already submitted.

26.     Auction.com's announcement did not disclose that the Notes to be offered for sale included certain Challenged Notes, the sale of which KIRP had objected to two weeks earlier.

27.     As had occurred in connection with Nationstar's earlier auction, due diligence records were made available to registered bidders in a secure data vault.

28.     From on or about February 22, 2013 through about March 4, 2013, TCA began its detailed due diligence financial review of each of the 547 Notes that formed a part of this auction.  That review included, but went far beyond the, records Nationstar had electronically deposited in the data vault.

-6-

**EXHIBIT 4**
**Page 63**

29.     Following the due diligence review, TCA decided to bid on pools encompassing 346 of the 547 Notes it had reviewed.

**KIRP Renews Its Objections**

30.     Upon information and belief, on March 4, 2013, KIRP, through its attorney, again notified Nationstar of its objection to the auction based on its assertion that Nationstar did not have the legal right to sell non-performing loans that formed part of the collateral for the RALI Trusts.

31.     Upon information and belief, on March 5, 2013, Nationstar's attorney responded to the March 4, 2013 letter from KIRP's attorney, stating that Nationstar would not respond before March 7, 2013, which was the day after the Second Auction was scheduled to end.

32.     Upon information and belief, on March 5, KIRP asked Nationstar to agree to a "standstill" period of five days during which Nationstar would not transfer, convey, or sell any loans that had been subject to auction through Auction.com, and to refrain from commencing any new auctions during that time. Upon information and belief, Nationstar did not respond to this request.

33.     Nationstar did not remove the Challenged Notes from this auction while it was in progress. At no time during the two days in which this auction was in progress did Nationstar inform TCA, or, upon information and belief any of the other registered bidders, about KIRP's claim regarding the Challenged Notes.

34.     On March 6, 2013, after completing its due diligence review, TCA placed bids, in multiple pools, on 346 of the 547 Notes offered for sale. Although unknown to TCA, some of the 346 Notes on which it had submitted bids were Challenged Notes.

- 7 -

FOR SETTLEMENT PURPOSES ONLY

**EXHIBIT 4**
**Page 64**

35.    At the conclusion of the auction, Auction.com confirmed in writing that TCA was the winning bidder with respect to multiple pools totaling 234 Notes. The winning bid price was approximately $55,312,005.

36.    The auctioneer's announcement that TCA had won these Notes created a binding obligation for Nationstar to sell the 234 Notes to at the agreed price. Although unknown to TCA, some of these Notes were Challenged Notes.

**KIRP Commences Litigation**

37.    On March 7, 2013, KIRP commenced an action in the Supreme Court of the State of New York, County of New York County, styled *KIRP, LLC v. Nationstar Mortgage, LLC*, Index No. 650794/13 (the "KIRP Action").

38.    On the same day, KIRP sought and was granted a Temporary Restraining Order ("TRO") enjoining the sale of "any non-performing mortgage loans collateralizing the certificates issued by the RALI Trusts that ha[d] already been auctioned through www.auction.com or other similar websites." As such, the TRO applied solely to the Challenged Notes. Among the allegations made by KIRP in its Complaint and submissions in support of its application for a TRO, were assertions that Nationstar was offering the Notes at substantial discounts—some as much as or more than 50%-- below their fair market value.

**Nationstar Refuses to Sell TCA Any of the Notes**

39.    Although only about 20% of the Notes that Nationstar had agreed to sell to TCA are Challenged Notes as to KIRP had any claim and were subject to the TRO, on March 15, 2013, Auction.com notified TCA that Nationstar had decided renege on its agreement to sell all the Notes as to which TCA had been the winning bidder.

- 8 -

FOR SETTLEMENT PURPOSES ONLY

**EXHIBIT 4**
**Page 65**

40.     On April 22, 2013, the Supreme Court dissolved the TRO on the stipulation of KIRP and Nationstar.

41.     In the KIRP Action, Nationstar has judicially admitted that the "unambiguous terms" of the applicable mortgage servicing agreements "expressly permitted" it to sell the non-performing Notes offered for sale at the auction.

42.     Since dissolution of the TRO, and in an effort to avoid litigation, TCA has again asked Nationstar to complete the sale.

43.     To this day, Nationstar still refuses to honor its obligations to TCA, and has informed TCA that it will not complete the sale of the Notes, even as to the 80-85% of the Notes that are not subject to the *KIRP* litigation.

## FIRST CAUSE OF ACTION
### (Breach Of Contract)

44.     TCA repeats all of the foregoing allegations as though fully set forth herein.

45.     Nationstar and TCA entered into valid, binding and enforceable agreements for the sale of 538 Notes for an aggregate purchase price of $149,357,120.

46.     Nationstar has, without legal excuse or justification, refused to perform its obligation to complete the sale of the Notes to TCA for the agreed upon price, despite due demand from TCA.

47.     TCA has fully and faithfully performed its own obligations or was otherwise excused from performance of those obligations by Nationstar's agent, Auction.com, or because of Nationstar's failure to perform.

48.     As a direct, foreseeable, proximate, and inevitable result of Nationstar's breach, TCA has sustained injury and damages in an amount not yet capable of precise ascertainment but believed to be in excess of $35 million.

- 9 -

**EXHIBIT 4**
**Page 66**

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

49.    TCA repeats all of the foregoing allegations as though fully set forth herein.

50.    In the alternative, if Nationstar's refusal to complete the sale of the Notes to TCA does not constitute a breach of contract, then TCA is entitled to relief under the doctrine of promissory estoppel because it reasonably relied to its detriment on promises and assurances made by Nationstar, through its duly authorized agent, Auction.com, that Nationstar would sell 538 Notes for an aggregate purchase price of $149,357,120.

51.    As a direct, foreseeable, proximate, and inevitable result of Nationstar's promises and TCA's reasonable reliance thereon, TCA has suffered injury and damages in an amount in an amount not yet capable of precise ascertainment.  Under California law, made applicable by the Auction Terms, TCA is entitled to recover from Nationstar an amount equal to the amount that would be recoverable for breach of contract, but in no event less than the amount of costs directly incurred by TCA in reliance on Nationstar's promise to sell the Notes to the winning bidder.

**WHEREFORE**, TCA respectfully requests entry of Judgment against Nationstar in an amount to be determined at trial, but believed to be in excess of $35 million, as well as all costs and expenses, including without limitation reasonable attorneys' fees, incurred by TCA in this action.

Respectfully submitted,

BUTZEL LONG
*a professional corporation*

Dated:   July , 2013
             New York, New York

By: _____
        Robert D. Piliero
380 Madison Avenue
New York, New York 10017

- 10 -

**EXHIBIT 4**
**Page 67**

(212) 818-1110
piliero@butzel.com
*Attorneys for Plaintiff TCA Holdings*
*2012 SC2 Manager, LLC*

FOR SETTLEMENT PURPOSES ONLY

- 11 -

EXHIBIT 4
Page 68

**PROOF OF SERVICE**
*NATIONSTAR MORTGAGE, LLC v. TRUMAN CAPITAL ADVISORS, LP*
**Case No. 13cv01114 RNB**

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen and not a party to the within action. I am employed in the County of Orange, State of California. My business address is 17901 Von Karman Ave., 10th Floor, Irvine, CA 92614.

On August 15, 2013, I served the foregoing document(s) described as **DECLARATION OF ROBERT PILIERO IN SUPPORT OF TRUMAN CAPITAL ADVISORS, LP'S MOTION TO DISMISS THE COMPLAINT** on all interested parties in this action as follows:

Erik Wayne Kemp
John B. Sullivan
Mark D. Lonergan
**SEVERSON AND WERSON**
One Embarcadero Center Suite 2600
San Francisco, CA 94111
Tele: 415-398-3344
Fax: 415-956-0439
Email: ek@severson.com;
jbs@severson.com;
mdl@severson.com
*Attorneys for Plaintiff Nationstar Mortgage, LLC*

(X)   **BY CM/ECF** for parties that are CM/ECF participants. Service is being made electronically on those parties on the attached list that are registered users of the Court's Electronic Case Filing System.

(X)   **(FEDERAL)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2013 at Irvine, California.

*[S]*

_____
Mariam Tarzi

158144

PROOF OF SERVICE